William Adams v. The State of Florida.—Syllabus.

WILLIAM ADAMS, PLAINTIFF IN ERROR, VS. THE STATE OF FLORIDA, DEFENDANT IN ERROR.

CRIMINAL LAW—FORMER JEOPARDY—DICHARGE OF JURY BEFORE VERDICT—EXCLAMATIONS OF CHILDREN AS PART OF RES GESTAE INADMISSIBLE WHEN—WHEN PARTY MAY IMPEACH HIS OWN WITNESS.

1. Section 1093 R. S. providing as follows: "When a jury after due and thorough deliberation upon any cause, shall return into court without having agreed on a verdict, the court may explain to them anew the law applicable to the case, and may send them out again for further deliberation; but if they shall return a second time without having agreed on a verdict, they shall not be sent out again without their consent, unless they shall ask from the court some further explanation of the law," is applicable alike to both civil and criminal cases; and confers upon juries the *legal right* to be discharged from any cause, when, after due and thorough deliberation, they come into court for the second time, after being recharged, and avow their inability to agree upon a verdict, without requesting further explanation of the law. The statute is designed to put a limitation upon the right of the court to detain a jury indefinitely in any cause, after it is ascertained that on due and thorough deliberation it is impossible for them to agree upon a verdict. A plea interposed by the defendant in a criminal cause, claiming an abatement of the prosecution on the ground of former jeopardy, that shows upon its face that the discharge of the jury before verdict, at the trial urged as the former jeopardy, was done in conformity to the provisions of this statute, is properly overruled upon demurrer thereto; particularly where the same plea shows that before their discharge the jury reported some of their number to be sick.

2. Where a little child, who, at three and a half years of age, was a bystanding spectator of a homicide, proves, nearly two years subsequent to the occurrence, not to be possessed of sufficient comprehension and intelligence to be competent then to testify as a witness, its exclamations and utterances at the time of the homicide, even though they may have been part of the *res gestœ*, are not admissible in evidence through the mouth of a third person who heard such exclamations at the time; and this, upon the ground that a child of such tender years, so lacking in intelligence and discrimination, can not comprehend passing events with anything like such accuracy as to render its exclamations or observations in reference thereto at all reliable or admissible as evidence.

3. Under Section 1101 R. S. that permits a party producing a witness to impeach him when he *proves adverse*, a witness can not be impeached who simply *fails to testify* to *beneficial* facts that were expected from him; but he must become *adverse* by *giving evidence that is prejudicial* to *the cause of the party producing* him. When a party's witness surprises him by not only failing to testify to beneficial facts expected of him, but *by giving harmful evidence* that is contrary to what was expected, then, as is the purpose of this law, he is permitted to *counteract the prejudicial effect of such adverse testimony* from his own witness, by proving that he has made statements on other occasions that are inconsistent with such *adverse evidence*.

4. Even where a party's own witness is properly impeached, under this statute, by proof of conflicting statements made on other occasions, the *conflicting statements* as made to and detailed by the *impeaching witness* should not be considered as substantive evidence in support of the party's cause who produced such impeached witness; but has weight only for the purpose of *counteracting or annulling the harmful effects of the adverse testimony given in the cause* by the impeached witness that is inconsistent with his statements shown to have been made on other occasions. It was never the purpose of the law to permit a party to produce a witness and upon his simple *failure to testify to expected facts*, without giving prejudicial evidence, to permit another witness to be produced, *ostensibly* for the purpose of *impeachment*, but in reality to introduce into the cause, as substantive independent evidence, the hearsay *conflicting statements* of the impeached witness alleged to have been made on other occasions.

Writ of Error to the Circuit Court for Columbia county.

The facts of the case are stated in the opinion of the court.

*Blackwell & Reese* and *A. J. Henry* for Plaintiff in Error.

*W. B. Lamar, Attorney-General,* for Defendant in Error.

TAYLOR, J.:

This is the second appearance of this case upon writ of error before this court—28 Fla., 511. After the reversal of the former conviction, the plaintiff in error, was again tried . at the Fall term 1893 of the Circuit Court for Columbia county, upon the same indictment, and was convicted of murder in the first degree with recommendation to mercy, and sentenced to imprisonment in the penitentiary for life; from this latter conviction he takes this his second writ of error.

Before going into the last trial the defendant interposed the following plea of 'former jeopardy :' "That the said State of Florida is barred and precluded from further prosecuting him herein because he says he has once been in joepardy under a former trial of said cause, for that heretofore, to-wit: on the 29th day of November, A. D. 1892, at the regular Fall term of this court duly organized and held according to law, said cause came on for trial and this defendant having been arraigned and plead not guilty, a jury was duly chosen, empaneled and sworn according to law; that the State Attorney prosecuted for said State of Florida, to maintain the issues in said cause produced the wit-

nesses in behalf of said State who were duly sworn and testified and gave evidence in said cause before said jury, and the said State Attorney prosecuting in behalf of said State as aforesaid having concluded the testimony for and in behalf of said State this defendant produced witnesses on his behalf, who were duly sworn and who testified and gave evidence in behalf of this defendant, before said jury and after said evidence was closed on behalf of the State and the defendant and after argument of counsel both on behalf of the State and the defendant the court delivered in writing its charge to the jury and submitted to the said jury the said cause, and thereupon the said jury retired from said court in charge of their bailiff to their room under instructions of the court at five o'clock p. m. on the 7th day of December, A. D. 1892; that at six o'clock on the same evening the jury were escorted by their bailiff to supper one hundred yards from the court house; at 7:30 o'clock the jury retired to their room, at which time bedding was carried into said room by leave of and in the presence of the court for the use of the jury; at seven o'clock the next morning thereafter the jury were escorted by their bailiff to breakfast and at eight o'clock the jury retired to their room; at nine o'clock on said morning said jury came into court and asked the court for the written charge, which was delivered to the jury and they retired to their room; at eleven o'clock on same morning the jury came into court and stated to the court that they could not agree; then the court did not explain to them anew the law applicable to the case, but sent them back without so doing; at three o'clock p. m. on the same day said jury came into court again and stated to the court that they could not agree, and further stated that three of the jury-

men were sick and that several others were worn out, whereupon the court discharged said jury against the consent of the defendant and without any good and sufficient cause; that said jury was discharged in the afternoon of the 8th day of December, 1892, and said term of court did not expire by operation of law until the twelfth day of December, 1892, whereupon the defendant prays the judgment of this court that said State of Florida is barred and precluded from further prosecuting this defendant for said charge of felony." To this plea the State interposed a demurrer that was sustained by the court.

The ruling upon this demurrer is assigned as error. A very strict rule was formerly applied prohibiting the discharge of a jury in a capital case, without the prisoner's consent, before an agreement upon a verdict; many of the courts holding that where they were thus discharged, simply because of their inability to agree upon a verdict, it constituted a bar to any further prosecution for the offense. The absurdity of this doctrine, however, afterwards became generally apparent, and the much relaxed and far more reasonable rule prevailed that, when, after a reasonable confinement, and after full instructions, the jury avow an utter inability to come to an agreement in respect to their verdict, the judge, in the exercise of a sound discretion, might discharge them, and that such discharge would not operate as a bar to further prosecution. And it is further held that the *necessity* for the discharge of the jury, whatever it may be, must appear upon the record, and it must be *adjudged by the court from proper evidence*, that such necessity existed, which made a discharge of the jury imperatively necessary. Proffat on Jury Trials, Sections 484 to 491 inclusive and citations.

These rules have been further relaxed here by the following provisions of our statute: "When a jury after due and thorough deliberation upon any cause, shall return into court without having agreed on a vereict, the court may explain to them anew the law applicable to the case, and may send them out again for further deliberation; but if they shall return a second time without having agreed on a verdict, thay shall not be sent out again without their own consent, unless they shall ask from the court some further explanation of the law." Section 1093 R. S.

This statute relieves the judge of much of his discretion of the adjudication of the question as to when the necessity has arisen for the discharge of the jury because of inability to agree upon a verdict; and confers *upon the jury* the legal *right to be discharged* when, after due and thorough deliberation, they came into court, after being re-charged, for the second time and avow their inability to agree, unless they shall then ask some further explanation of the law. This provision was first enacted as Section, 27 of Chapter 1628, approved July 28th, 1868, entitled, "An Act relating to Jurors." Counsel for plaintiff in error contends that it does not apply to criminal cases, but relates to the trial of civil causes alone. Such is not our construction of its provisions. It was originally embodied as part of a general statute relating to jurors in all causes civil and criminal, and was and is designed to put a limitation upon the right of the court to detain a jury indefinitely in any cause, civil or criminal, after it is ascertained that on due and thorough deliberation it is impossible for them to agree upon a verdict. It can not be successfully argued that the discharge of a jury before verdict, when done under and in accordance with the provisions of this statute, can have the effect

of precluding further prosecution under the constitutional inhibition against a second jeopardy for the same offense.

The plea of the defendant shows upon its face that the provisions of this statute were substantially complied with in the discharge of the jury to whom the cause had been submitted at the former trial. It shows that the jury had the case under deliberation nearly, if not quite, twenty-four hours; that they came into court without having agreed upon a verdict and requested that the written charge of the court be delivered to them, which was done. This was tantamount to a repetition to them by the court of its charge; it shows that after this they came into court and avowed their inability to agree; that the court again sent them back for further deliberation; that several hours afterwards they came into court for the third time, again avowing their inability to agree upon a verdict, whereupon the court discharged them. The plea showing, as it does, that the discharge of the jury at the former trial was done in conformity to law because of their inability to agree upon a verdict, does not disclose any legal bar to further prosecution, and the State's demurrer thereto was properly sustained. Besides this the plea shows that before their discharge the jury reported three of their number to be sick, which, of itself, would have justified their discharge.

The deceased was called to the door of his house at night and received his death shot while standing in the partly opened door. His little son, according to the testimony of the widow of the deceased, who was then only three and a half years old, followed his father to the door, and, immediately after his father was shot, ran out on the front porth, while his mother remained inside the house with his wounded father,

whom she assisted in getting to his bed.　Over the objection of the defendant the court permitted Mrs. Minnie Moore, the widow of the deceased and mother of this little child, to testify at the trial that when the child ran out on the porch when his father was shot he, (the child), exclaimed: "Oh man, why have you shot my papa," and that she then called the child to her, and that he then said : "Oh, mamma, there's two men out there; there's a white man and a negro, the white man's face was all covered with beard," etc. The objection to this testimony was that the little child, whose exclamations are here attempted to be given through the mouth of its mother, was incompetent to testify.　We think the court erred in admitting this evidence.　In 3, Rice on Evidence, page 291, it is said: "The admissibility of children is now regulated, not by their age, but by their apparent sense and understanding.　It is a question addressed to the good sense and discretion of the judge whether the child is competent or not; but neither the testimony of the child without oath, nor evidence of any statement which he has made to any other person, is admissible. This is now the established rule in all cases, criminal and civil."　Commonwealth vs. Hutchinson, 10 Mass., 224; Regina vs. Nicholas, 2 Car. & Kir., (Eng. C. L.), 246.　Regina vs. Perkins, 2 Moody's Cr. Cas., 135. The record shows that this little child was afterwards offered as a witness for the State and after being examined by the court as to his competency the court ruled as follows: "I don't think this child's comprehensions is sufficiently developed to testify; I don't think he is sufficiently developed to understand the obligations of an oath; I don't think he is a competent witness."　Upon excluding the child as a witness the court of its own motion required the stenographer to

read the evidence of Mrs. Moore. The stenographer read therefrom as follows: "The child ran out on the porch when his father was shot and said: "Oh, man, why have you shot my papa;" the court then stopped him and ruled as follows: "Gentlemen of the jury, that much of the testimony I allow to go to you; after reflection I am satisfied that statement made by the little boy and rehearsed in Mrs. Moore's testimony; the balance of what he said to his mother is withdrawn from you, not to be considered by you in making up your verdict." This ruling was no doubt intended to withdraw from the consideration of the jury all of the little boy's utterances except the one exclamation: "Oh, man, why did you shoot my papa," but the ruling, as represented to have been made in the record before us, is confusing and did not make it entirely clear to the jury what part of it they were to consider, and which part not to entertain. We think the whole of the child's exclamations and utterances on the occasion should have been excluded. If, nearly two years after the occurrence, this child, with its increased age, was found by the court not to have sufficient comprehension and intelligence to be competent as a witness, it would seem to be superfluous to say that, at the time of the occurrence, when he was two years younger, he would hardly have been possessed of sufficient discrimination or intelligence to comprehend passing events with anything like such accuracy as to render his exclamations or observations in reference thereto at all reliable, or admissible as evidence even though they may have been part of the *res gestae*. The whole of this child's exclamations and sayings should have been excluded.

13

Frank Walker, a witness produced by the State, testified: That he remembered the circumstance and time of the killing of the deceased. That on the night of the homicide he was over at one Jim Wright's and in going over there he had to cross a creek called "Falling Creek;" the place of crossing being about a quarter of a mile from Wright's. That he crossed the creek going to Wright's about 7 o'clock. That he left Wright's to go home about half past seven. That his brother, Hardy Walker, married a sister of the deceased. That he went to Jim Wright's house twice that night. That he did not see any one there at the creek that night. That he had never stated to anyone theretofore that he had seen two men there at the creek that night. For the avowed purpose of impeaching this witness as to that part of his evidence wherein he states: "That he did not see anyone at the creek that night, and that he had never told anyone that he had seen two men at the creek that night," the court, over the defendant's objection, permitted the State's counsel to ask the witness the following questions as a predicate for the impeaching evidence: "Didn't you tell Will Prevatt at White Springs, Florida, in the Spring after Will Adams had been tried the first time, sitting on the back steps at Mr. Ogden's store, that you saw two men at Falling Creek, or near there, on the night that Jim Moore was killed, and that you took it to be Ike Spanish and Will Adams?" "Didn't you at the same time and place in answer to a question from Will Prevatt, that you would go into court and swear to that, answer, that you would do it?" To both of these questions the witness answered that he had never made any such statements. The court then permitted the State Attorney, over the defendant's objection, to elicit from Will Prevatt the

following evidance: "At White Springs in the Spring shortly after the first trial of this case on the back steps of Mr. Ogden's store, Frank Walker was telling me why he left home, and told me that he saw Ike Spanish and Will Adams right there by Falling Creek on the night Jim Moore was killed. I asked him, if he would go into court and swear to that? and, with an oath, he told me that he would. We were alone when he told me this." The defendant's counsel objected to the admission of all this evidence upon the ground that Frank Walker, the State's witness sought to be impeached thereby, was not an adverse witness, and assigns its admission as error.

Our statute on the subject of the impeachment of a witness by the party producing him is as follows: "A party producing a witness shall not be allowed to impeach his credit by general evidence of bad character, but he may, *in case the witness prove adverse*, contradict him by other evidence, or prove that he has made at other times a statement inconsistent with his present testimony; but before such last mentioned proof can be given, the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he made such statement." Section 1101, R. S. It is very erroneous to suppose that, under this statute, a party producing a witness is at liberty to impeach him whenever such witness simply fails to testify as he was expected to do, without giving any evidence that is at all *prejudicial* to the party producing him. The impeachment permitted by the statute is only in cases where the witness proves *adverse* to the party producing him. He must not only fail to give the *beneficial* evidence expected of him, but he must become

*adverse* by *giving evidence that is prejudicial to the cause of the party producing him.* When a party's witness surprises him by not only failing to testify to the facts expected of him, but by giving *harmful evidence* that is contrary to what was expected, then, as is the purpose of this law, he is permitted to *counteract the prejudicial effect of the adverse testimony* of such witness, by proving that he has made statements on other occasions that are inconsistent with his present *adverse evidence.* It never was the purpose of this statute to allow a party to put up a witness for the purpose of *endeavoring* to get from him *beneficial* evidence, and upon his simple failure to testify to the desired facts, to permit him to get the *benefit* of those *expected facts*, as substantive evidence through the mouth of another witness, under the guise of *impeachment.* Evidence adduced in this manner is nothing more than the veriest hearsay, and is inadmissable. Even where a witness is properly impeached by proof of conflicting statements made on other occasions, the *conflicting statements* as made to and detailed by the *impeaching witness* should not be considered as substantive evidence in sustenance of the party's cause who produced the impeached witness; but has weight only *for the purpose of counteracting or annulling the harmful effects of the adverse testimony in the cause given by the impeached witness that is inconsistent with his statements testified to have been made on other occasions* Bennett vs. State, 24 Tex., App., 73; White vs. State, 10 Tex., App., 381; Miller vs. Cook, 124 Ind., 101; Conway vs. State, 118 Ind., 482; Hull vs. State, 93 Ind., 128; People vs. Safford, 5 Denis, 112; People vs. Jacobs, 49 Cal., 384, Com. vs. Welsh, 4 Gray, (Mass.), 535; Smith vs. Price, 8 Watts, (Pa.), 447. It is very evident from the record

before us that the witness Frank Walker did not give any evidence that was at all prejudicial to the States case, but simply failed to testify to given facts that it was supposed that he knew and that would have been beneficial; and it is further evident that he was introduced by the State Attorney with the expectation, from the experience of the former trial of the cause, that he would not testify to having seen Ike Spanish and the accused at the crossing of Falling Creek on the night of the homicide; and it is equally evident that the testimony of the witness Will Prevatt, detailing Walker's former declarations to him on that point, was introduced, *ostensibly* to discredit and impeach Walker, but, in truth, for the purpose of operating as independent evidence to establish the fact that Spanish and Adams were seen together at that time and place. It was never the purpose of our statute to permit the proof of facts to be accomplished in any such manner. The error in the admission of this evidence is fatal to the propriety of the conviction had. The only direct positive evidence on the part of the State that places the accused at the scene of the homicide is that of Ike Spanish, an indicted accomplice. He testified that Will Adams, the accused, fired the fatal shot, and that he and Adams were there together alone; that in going there and returning they passed by Jim Wright's place and crossed Falling Creek at the crossing near his place, that is not far from the scene of the homicide, at about the time that it was attempted to be shown that Frank Walker saw them there. Could it have been proven by proper evidence that Spanish and Adams were seen together at this time and place, it would have been strongly corroborative of Spanish's evidence. This highly material corroborative proof

was conveyed to the jury illegally as we have seen; how much weight it had in the production of the verdict found it is not for us to surmise. It was fraught with capacity for harm to the accused, and the presumption is that it wrought its hurtful effect. Hawkins vs. State, 32 Fla., 248. The witness Ike Spanish was permitted, over the defendant's objection, to testify to various conversations had by him with one T. P. Bethea, who is also indicted as an accessory before the fact with the accused, that occurred prior to the homicide while the accused was not present; and the admission of these conversations, held in the absence of the accused, is assigned as error. There is no merit in this assignment. It has been repeatedly held here that an accomplice is a competent witness, and that a conviction may be had upon his uncorroborated testimony where it satisfies the jury beyond a reasonable doubt. Jenkins vs. State, 31 Fla., 196, and cases there cited. If the accomplice is competent to establish any phase of the case he is competent to prove all essential and pertinent facts therein within his knowledge. By the evidence of this witness, if true, it is shown that there was a conspiracy between Bethea, Adams and himself to commit this homicide. The existence of the conspiracy having been shown by him, it was not error to permit him to testify to declarations made to him, in the absence of the accused, by another conspirator, when made prior to the completion of the common design, and in reference to and in furtherance of such common design. Hall vs. State, 31 Fla., 176. While we do not now decide as to whether the objectionable features in the charges of the court hereafter to be pointed out would, of themselves, be cause for reversal, yet, as the case has to go back for another trial because of the error already found, we will sug-

gest such corrections in the instructions given as we think to be proper.

In the charge upon reasonable doubt we think the following formula should be omitted, *viz:* "Nor are you at liberty to disbelieve as jurors, if, from the evidence, you believe and are satisfied, beyond a reasonable doubt, as men. Your oaths impose on you no obligation to doubt where no doubt would exist if no oath had been administered." It adds nothing to the charge in explanation or elucidation of what character of doubt must exist in order to justify an acquital; but, on the contrary, is confusing in its tendency, and tends to impress upon the minds of the jury the idea that their oaths as jurors do not impose upon them the duty to give the evidence any more grave, careful or solemn consideration than if they were forming conclusions upon it as citizens without the obligation of their oaths as jurors. The following clause of the same charge, *viz:* "But if, after a careful consideration of all the evidence, you feel an abiding conviction in your minds that the accused is guilty as charged, then, in law, you have no reasonable doubt and you should find a verdict of guilty," should be amended by inserting therein, after the word "mind," the words: "to a moral certainty." To the following instruction, *viz:* "In the case at bar, if you are satisfied from the evidence, under these instructions, that the defendant at the time and place mentioned in the indictment, shot and killed James Moore, the deceased, as charged in the indictment, and that before, or at the time the fatal shot was fired the defendant had formed in his mind a wilful purpose and intention to take the life of the deceased, and the fatal shot was fired in furtherance of such unlawful purpose, and that the deceased James

Moore was killed then and thereby, then you may and
should find the defendant guilty of murder in the first
degree; in which case the form of your verdict may
be. 'We, the jury, find the prisoner at the bar guilty
of murder in the first degree, so say we all,' one of
you signing as foreman and dating it," it would have
been better to add that such killing must have been
done "without justification or excuse;" and from it
omit telling the jury what *particular degree* of murder
their verdict should find; and, too, we think it would
have been better to have omitted from it the form that
the verdict should be, especially as the court had, in a
former charge, already given formulas for verdicts in
such cases. The following clause of the charge upon
the question of an *alibi*, *viz:* "And when an *alibi* is
established by the evidence to the satisfaction of the
jury, it is conclusive evidence of the innocence of the
person accused; and in the case at bar, if you find
from the evidence and are satisfied that the defendant
William Adams was not present at the time and place
the deceased was killed, you should find a verdict of
not guilty. But to make the defense of an *alibi* avail-
able as a perfect defense, the evidence of its existence
must cover the whole time when the presence of the
defendant was required to commit the criminal act," is
decidedly faulty in requiring the evidence of the *alibi*
to *satisfy the jury* that the accused was *not present*
at the time and place of the crime. Proof of an *alibi*
is sufficient to acquit, if it, considered in connection
with all the testimony, raises a *reasonable doubt* in the
minds of the jury of the presence of the accused at
the commission of the crime. It is not necessary that
it should *satisfy* the jury that he was not so present.
Murphy *et al.* vs. State, 31 Fla., 166.

The last clause of this charge would more accurately express the law as to the time to be covered by the proof of the *alibi*, by addition thereto of the following: "or it should locate the accused at some other point, at such a time, either before or after the commission of the crime, as made it impossible for him to be present at its commission." The following clause at the conclusion of the charge on *alibi, viz:* "For obvious reasons, the evidence for as well as against the defense of an *alibi* in the case at bar demands your most careful and thoughtful consideration," we think should have been omitted. It would have been well enough to impress the jury with the idea that the *entire evidence* in the cause, *touching all of the issues* therein demanded their most careful and thoughtful consideration, but to single out the defendant's effort to establish an *alibi*, and to concentrate the jury's most careful and thoughtful consideration upon that phase of the case alone, might have had a tendency to impress the jury unfairly, with the idea that the court viewed that phase of the case with suspicion. The following charge upon the evidence of accomplices, *viz:* "The principles upon which the evidence of accomplices has been and is received in evidence and considered legal and competent is that, in many cases, were it otherwise, it would hardly be possible, if not altogether impossible, to prove the guilt of one who violates the law under cover of darkness or secrecy. Where the evidence of an accomplice is corroborated by facts and circumstances proven, tending to connect the defendant with the homicide, or by the evidence of other creditable witnesses, it is entitled to more weight than when not so corroborated, and the corroborating testimony should tend to connect the accused with the crime," we think should have been omitted. As ruled

upon so often by this court in other cases, the court has no right to instruct the jury upon the *weight* to which any evidence in a cause is entitled. Wheeler vs. Baars, 33 Fla., 696, 15 South. Rep., 584, and cases cited.

The following clauses of the charge upon the evidence of the accomplice, Ike Spanish, is decidedly objectionable for the same reason last mentioned, and should not have been given, *viz:* "If, from the evidence, you should believe that the witness Ike Spanish was reluctant to participate in the killing of the deceased; or to be present when he was killed, and should further believe that his presence at the time and place the homicide was committed was secured by threats of personal violence made by the defendant or by threats made by the defendant T. P. Bethea in the presence or in the absence of the defendant, if made as testified to, then you would be justified in giving to his evidence more weight than, if, from the evidence, you should believe that he went of his own free will and choice and participated in the homicide, and in the determination of the question as to whether he was present at the killing of the deceased willingly or unwillingly, you have the right to inquire from the evidence what motive incited him to be present at the killing, if any has been shown in the testimony, that induced him to be present when the homicide was committed."

For the errors pointed out the judgment of the court below is reversed and a new trial awarded.