FLORA BURCH, *Plaintiff in Error*, v. THE STATE OF FLOR-
IDA, *Defendant in Error*.

## Opinion Filed April 28, 1923.

Under Section 2710, Revised General Statutes, permitting a party
   producing a witness to impeach him when he proves adverse,
   a witness can not be impeached as to his statements when he
   simply fails to testify to beneficial facts that were expected
   from him, and when he states nothing that is prejudicial to
   the party who offers him.

A Writ of Error to the Circuit Court for Manatee
County; M. A. McMullen, Judge.

Judgment reversed.

*John B. Singletary* and *J. J. Stewart*, for Plaintiff in
Error;

*Rivers Buford*, Attorney General, and *Marvin C. McIn-
tosh*, Assistant, for the State.

BROWNE, J.—The plaintiff in error, Mrs. Flora Burch,
was tried and convicted of assault with intent to murder
Mrs. Ruby Harris.

The only testimony tending to connnect Mrs. Burch with
the shooting is that of Mrs. Harris.

On the question of identification, she testified: ''I was
in the house when some one knocked at the door, and I
went to the door, and my first impression when I went to
the door it was a little negro, dressed in men's clothing.
After I got out there, as well as I could recognize the
party, I recognized as far as I could tell, it being Flora

Burch. She came up on the porch and asked me where my husband was.'' She also testified to quite a bit of conversation between her and her assailant to the éffect that they ''walked around on the porch awhile,'' that Mrs. Harris went in the house and ''got a pencil and paper and brought it back,'' and after some further time together, the witness says: ''I don't know who made a move first to turn, but any·way we turned to go back around the porch, and then the next thing I knew I was shot in the back.''

When asked, ''when this person came up on your front porch· and you came out, did you recognize who it was?'' She replied, ''Yes, sir;'' although she had just before testified that her ''first impression when she went to the door was that it was a little negro dressed in men's clothing.''

From then on her identification of her assailant is vague and uncertain, consisting of expressions such as this: ''As well as I can identify her it was Flora Burch.''

On cross-examination she testified that her assailant was dressed in men's clothes; had on ''a cap and khaki trousers, as well as I can remember.'' She does not ''remember whether there was a coat or not.'' When asked, ''can you swear positively that it was Flora Burch?'' She answered: ''Well as far as I can identify it was.'' She was then asked, ''could you identify her with sufficient positiveness to be sure and say that you know it was Flora Burch?'' To which she replied: ''Well I don't know what to say, only what I have already said, as well as I could understand her voice and what I could see of her, and· by wanting my husband, that is all I could say; that is all I could say; that is all of the way I could express it.'' When further pressed as to whether or not she could

say it was Flora Burch, she answered: "Well I don't quite understand it, that is the only way I can express it."

The testimony then proceeded as follows: "Q. Well it was at night, wasn't it, Mrs. Harris? A. Yes, sir. Q. I believe you stated that you first thought it was a negro, didn't you? A. When I first went out on the porch. Q. And you say it was at night, and the question I wish to ask you is, can you positively say that you identify her with sufficient certainty to swear that you know it was Flora Burch? A. I answered that as far as I can answer it.

"Juror. Mrs. Harris, simply say yes or no; that will be what we want. A. Well I don't see how I can answer it just that way."

To offset this testimony Flora Burch sought to establish an alibi by testifying that from half past eight until half past eleven o'clock on the night of the shooting she was continuously in the company of other people, except for an interval of about a half hour, when she went to Mrs. Horton's home where she was staying, to use the bath room.

With regard to this interval, which was about the time that Mrs. Harris was shot, she had only her own word to establish her whereabouts.

Against Mrs. Harris' attempt at identification, Flora Burch had also only her own word. She denied that she was at Mrs. Harris' house on the night of the shooting; that she had not shot her; that she was dressed in men's clothes.

To offset the effect of her positive and detailed denial of any complicity in or knowledge of the shooting, the State sought to besmirch her character by a very reprehensible

method of examining Mr. A. W. Harris, husband of the assaulted woman, who was the first witness called by the State.

This examination was conducted by the Assistant State Attorney in the presence of the State Attorney.

A woman's reputation may be injured, her character blackmailed, and her reliability and trustworthiness impaired, by the mere asking of questions containing statements or implications that she is lewd and of unchaste character.

Over the earnest and proper objection by defendant's counsel, testimony such as this was allowed to be introduced: "Q. Mr. Harris, for the two or three years or more preceding the 16th day of July of this year, what has been your relationship to Mrs. Burch, the defendant? A. It has been friendly. Q. How friendly? A. Well I don't know just exactly how to answer that question. Q. Well will you designate to the jury the extent and characteristics of your relations to Mrs. Burch? A. I have been in her presence numbers of times, and she worked in the same office at the city hall here at Bradentown; I was chief of the fire department and the two are combined down there, and I was more or less in her company at that time while she was working there. And I have been in her company quite often since then. Q. Now Mr. Harris, your wife objected to your being in Mrs. Burch's company so much did she not? Q. Mr. Harris, I would like for you to state what the attitude of your wife has been towards your friendship with Mrs. Burch and your spending the amount of time with her that you have spent with her during the two years preceding the 16th day of last July? A. I don't know that she has ever expressed an opinion to me. Q. Mr. Harris, what I was

asking you about was her attitude towards this friendship, not any opinion she expressed. If you know what her attitude towards that relationship was, please state that to the jury. A. I do not know. Q. Mr. Harris, have you been at home, that is at the house where you and your wife now live, at any time during this year when Flora Burch, the defendant, was there, and your wife was there, and a conversation took place between these two women? A. Yes, I was there. Q. How many times have you known of your wife and the defendant being at your house together and having a conversation there, during this year and preceding the 16th of July?

"The Court: I will ask the State whether or not you propose by this question to establish the fact that these conversations were in reference to the relations existing between the defendant and the witness.

"Mr. Knowles: Yes, if the court please, and I believe the question was limited to this year and preceding the 16th of July; and the purpose of the question is to show a conversation that took place on the relations existing, and Mrs. Harris attitude toward that relation. Mr. Knowles:Yes, sir. A. Once. Q. Now Mr. Harris, will you state as nearly as you can the date of the conversation? A. The best I can remember it must have been some time in May. Q. Now will you state to the jury what was said by your wife upon that occasion to the defendant. Flora Burch; state in detail as nearly as you can. A. I wouldn't attempt to say anything that was said, I don't remember. I didn't pay any attention to it all. I wasn't present all during the time she was there, and about the only thing I remember was when she was leaving. A. At that time my wife asked Mrs. Burch when she came back in town again to come to see her, and she immediately went and got in

the car and drove off.  Q.  Did Mrs. Burch say anything?
A.  She said she would.  Q.  Mr. Harris were you there
when Mrs. Burch came to the house?  To which action of
the court in overruling said objection the defendant then
and there duly excepted.  A.  I was in the back part of
the house.  Q.  Did she come alone or come with someone?
A.  She came with some one.  Q.  Who did she come with?
A.  I don't remember.  I don't know who it was.  It was
dark—at night.  Q.  You don't remember any part of the
conversation that took place between them while they were
in the house?  A.  I couldn't say; no sir.  Q.  I am not
asking you whether you can say or not, Mr. Harris.  I am
asking you whether you remember.  A.  No, sir, I don't.
Mr. Knowles:  If the court please, the testimony of the
witness has been disappointing and contrary to what coun-
sel had reason to believe the testimony of the witness
would be, and we desire to state to the court that we wish
to impeach our own witness, for the reason that he has
gone contrary to the testiomny we had reason to believe he
would give.  The Court:  You have been taken by sur-
prise?  Mr. Knowles:  Yes, sir.  The Court:  The excep-
tion to the rule of impeaching one's own witness is that
they are taken by surprise at the testimony.  Just as to
how far the court is supposed to inquire into that I am
not clear.  Or whether the statement of counsel that they
are taken by surprise is sufficient or not.  I will ask you,
Mr. Knowles, if the witness is making contradictory state-
ment to what he has previously made?  Mr. Knowles:  If
your Honor please, the word 'compromising' would be
better than the word contradictory.  The witness is not
giving the testimony we had reason to believe he would
give, and the testimony which we put him on the stand to
give.  The witness is skillfully avoiding contradiction,
but he is compromising.  The Court:  I don't think you

can impeach him if he is evading. If he is contradicting testimony and you are taken by surprise then you can impeach him. Mr. Knowles: That most important feature for which we put the witness on the stand, if I understand what the word contradicting means, he is contradicting what we had reason to believe he would testify, and that is in the particular of showing motive. In other words, to show the relation existing between him and the defendant Flora Burch for the purpose of showing the motive Flora Burch would have for committing the crime if she did commit any. Your Honor has heard me ask him if the extent of their relations was being in company with each other, and we had reason to believe that was not the relationship. The Court: Did you have reason to believe that by reason of any previous statements of the witness? Mr. Knowles: We had reason to believe, if the court please, that the witness would testify that he had had improper relations and illicit intercourse with the defendant Flora Burch, and he would so testify in this case, to show the motive which the defendant Flora Burch would have to murder his wife. The Court: And your expectation was from statements that had been made by the witness? Mr. Singletary: If your Honor please, I want to enter into the record here an exception to counsel going into detailed statements of fact he proposes to establish and show, in the presence of this jury, without his being under oath. The Court: What was the answer to my question, Mr. Knowles? Mr. Knowles: The basis we had for believing we could prove that by this witness was his statements made to State's counsel, and we are not proposing to go on any other basis whatever. The Court: Very well; you may proceed if that is the basis.''

At this point at the suggestion of counsel for the defense, the court directed the jury to retire from the court room

while the matter was further discussed. Upon the return of the jury into court the testimony along this line proceeded as follows: "Mr. Harris, isn't it a fact that about ten o'clock on the forenoon of July 18th, 1921, in the office of the county judge in this court house, you stated to Mr. E. P. Wilson, State Attorney, that you had had sexual intercourse with the defendant Flora Burch from time to time in the past, and that just preceding the shooting of Mrs. Harris that you had broken off having such relationship with the defendant? A. Positively no. The Court: I will ask the State on the strength of that last ground of objection, if you did expect to get the testimony from the witness? Mr. Knowles: If the court please, we seriously and in all good faith, expected to establish by this witness the very things which we have shown in the absence of the jury. Mr. Singletary has said this, that and the other, but I don't think he himself thought it seriously. Mr. Singletary: If the Court please, I have called the court's attention, and I desire this to go in the record, I have said nothing in levity nor in lack of seriousness, nor have I said anything without a consciousness of the seriousness of the situation, and a sense of my obligation and duty in connection with this case. I thought I meant all that I said. I have not yet heard counsel say that when he put this witness on the stand he did believe that this witness would testify that he had had sexual intercourse with this defendant. He has avoided saying that, and I believe purposely. The Court: He said it just now, Mr. Singletary. Mr. Singletary: I didn't hear him, your Honor. The Court: Isn't that what you said, Mr. Knowles? Mr. Knowles: It is, your Honor, and I have said it several times. Q. Now Mr. Harris, in giving this answer, 'positively no,' do you mean to deny each and every part of this statement to the State Attorney as I have propounded

it to you in this question, or to deny only a part of such statement to the State Attorney? A. I mean to deny every bit of the question you asked me at that time. Q. Then Mr. Harris, you mean to deny that you told the State Attorney, Mr. Wilson, on the 18th of July, in the County Judge's office in this court house that you had had illicit sexual relations with Flora Burch the defendant? A. I positively do, and I will add, to anybody else. Q. Now then, Mr. Harris, I will ask you if it is not a fact that on this same date, Monday the 18th of July of this year about ten o'clock in the forenoon, in the County Judge's office in this court house you stated to Mr. E. P. Wilson, the State Attorney, that the defendant Flora Burch had upon one occasion been down to your house in the night time dressed in a khaki suit of a soldier? Mr. Singletary: If your Honor please, I desire to save time by making objection on the general grounds we have already interposed, and on the further ground that it is immaterial to the issue being tried here whether such statement was made or not. The Court: I don't think that question is a proper subject of impeachment at this time, Mr. Knowles, because this is the first time that has been mentioned and you cannot say you have been surprised on that. Mr. Knowles: If the court please, if I understand the rule, we may impeach him on any matter relevant to the issue being tried, and I think it is material to show the defendant has been down to his house in the night time. Q. Mr. Harris, I will ask you if the defendant Flora Burch, previous to the 16th of July of this year, had ever been to your house in the night time dressed in a khaki suit of a soldier, and had conversation with you? A. Yes, she has been there. The Court: Can you fix the time a little closer, Mr. Knowles? Mr. Knowles: If your Honor please, I am asking this solely to pave the way for impeachment and I don't expect the witness to

testify truthfully in answer to my question; and the state-ment he made to the State Attorney upon which I propose to impeach him had no reference to time, therefore I can't identify it as to time in laying the ground for impeach-ment.     Mr. Singletary: Now if your Honor please, if there was no statement with reference to time, it may have been ten years; there may have been absolutely no relation between that occurrence and the one the defendant is standing here charged of.   And further than that, may it please the court, the whole impeachment proceeding is taken out of court when counsel admits that when he pro-pounded the question to him he did not expect the answer to be the truth.   He puts a man on there for whom he vouches and does not expect the truth, then he cannot im-peach him.   Mr. Knowles: I did expect it when I put him on, if the court please.   Mr. Wilson: If the court please, the fact that the State put the witness on and vouched for him is correct.   The State had no knowledge that this wit-ness would absolutely deny statements he had made, when it put him on, and the State is surprised at the attitude of this witness at this time, and for that very reason we seek to impeach him.   Q.   Answer the question, Mr. Harris. A.   She has been at the house but I could not say as to whether she had on a khaki suit or not.   Q.   Now Mr. Har-ris isn't it a fact that on the 18th of July about ten o'clock in the forenoon in the office of the County Judge here in the court house, that you stated to Mr. E. P. Wilson, State Attorney, that Flora Burch had been to your house once in the night time dressed in a khaki suit of a soldier and that while there she had conversation with you?''   .   .   .

Continued attempts to besmirch the good name of the defendant, by questions embodying charges of immoral conduct on her part were made by the Assistant State At-

torney, and permitted by the court, but enough is set forth here to show its highly improper character.

In this examination we find not only the insinuations and charges contained in the questions to the witness but remarks by the State Attorney, the Assistant State Attorney and by the court which tended to discredit the defendant.

When an objection was made by the defendant to the question, "how many times have you known your wife and the defendant being at your house together and having a conversation there during this year and preceding the 16th of July," the court made this comment: "I will ask the State whether or not you propose by this question to establish the fact that these conversations were in reference to the relations existing between the defendant and the witness?" Mr. Knowles: Yes, if the court please, and I believe the question was limited to this year and preceding the 16th of July; and the purpose of the question is to show a conversation that took place on the relations existing, and Mrs. Harris' attitude toward that relation." When the Assistant State Attorney answered this question, the court strengthened his reply by adding: "Thereby establishing a motive and intent?" And upon the Assistant State Attorney replying "Yes, sir," the court overruled the objection.

When the right of the State to impeach its own witness was being presented to the court, the Assistant State Attorney stated in the presence of the jury, what "he had reason to believe the witness would testify to," and after the witness had denied any improper relationship with Flora Burch, the Assistant State Attorney in the presence of the jury stated that he had "reason to believe that that was not the relationship," and the court, strengthened the

effect of this by asking him: "Did you have reason to believe that, by reason of any previous statements of the witness?" Whereupon the Assistant State Attorney made this statement in the presence of the jury: "We had reason to believe, if the court please, that the witness would testify that he had had improper relations and illicit intercourse with the defendant Flora Burch, and he would so testify in this case, to show the motive which the defendant Flora Burch would have to murder his wife." This the court strengthened by adding: "And your expectation was from statements that had been made by the witness."

No conclusion can be reached from this procedure, than that the examination of this witness was for the purpose of besmirching the character of the defendant and injuring her good name, so that when she took the stand to deny her presence at the scene of the shooting, the jury would regard her as a bad woman and give little or no weight or consideration to her testimony.

Vicious falsehoods can be circulated by innuendo, and when they are permitted in a court of justice for the purpose of discrediting a defendant so that her testimony would not have the same weight with the jury as if she had gone before them with the presumption of chastity that belongs to every woman, her constitutional right to a fair and impartial trial has been invaded.

It may be that a single improper question is not always cause for reversal, but where the examination of a witness is conducted in the manner of that of the witness Harris, and the court not only fails to protect the accused but aids in the assault on the good name of the defendant,—an assault unwarranted by the facts so far as the record dis-

closes,—the defendant is deprived of her constitutional right to a fair and impartial trial.

The objections to this line of testimony should have been sustained upon another ground.

Mr. Harris was the State's witness, and although he failed to testify as the State hoped or expected he would, he did not give any evidence that was in the least prejudicial to the State. That entire line of testimony, therefore, was improper as seeking to lay a predicate for his impeachment when he had not given any testimony adverse to the State that would have permitted his impeachment.

In Mercer v. State, 41 Fla. 279, 26 South. Rep. 317, the rule is thus laid down: "Under Section 1101, Revised Statutes, permitting a party producing a witness to impeach him when he proves adverse, a witness can not be impeached as to his statements when he simply fails to testify to beneficial facts that were expected from him, and when he states nothing that is prejudicial to the party who offers him." Adams v. State, 34 Fla. 185, 15 South. Rep. 905; Olds v. State, 44 Fla. 452, 33 South. Rep. 296; Whorley v. State, 45 Fla. 123, 33 South Rep. 849; Skinner Mfg. Co. v. Douville, 54 Fla. 251, 44 South. Rep. 1014; Cross v. Robinson Point Lumber Co., 55 Fla. 374, 46 South. Rep. 6.

The objections of the defendant to this testimony and to the method of the Assistant State Attorney in conducting his examination, should have been sustained, and overruling them and permitting the unseemly procedure we have detailed, were reversible errors.

The judgment is reversed.

TAYLOR, C. J., AND WHITFIELD AND ELLIS, JJ., concur.

WEST, J., specially concurs.

WEST, J., concurring.

The statute of this State allowing a party producing a witness to impeach him is as follows:

"A party producing a witness shall not be allowed to impeach his credit by general evidence of bad character, but he may, in case the witness prove adverse, contradict him by other evidence, or prove that he has made at other times a statement inconsistent with his present testimony; but before such last-mentionend proof can be given, the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he made such statement." §2710 Rev. Gen. Stat.

Construing this statute, the court, in Adams v. State, 34 Fla. 185, 15 South. Rep. 905, said: "It is very erroneous to suppose that, under this statute, a party producing a witness is at liberty to impeach him whenever such witness simply fails to testify as he was expected to do, without giving any evidence that is at all *prejudicial* to the party producing him. The impeachment permitted by the statute is only in cases where the witness proves *adverse* to the party producing him. He must not only fail to give the *beneficial* evidence expected of him, but he must become *adverse* by *giving evidence that is prejudicial to the cause of the party producing him.* When a party's witness surprises him by not only failing to testify to the facts expected of him, but by giving harmful evidence that is contrary to what was expected, then, as is the purpose of this law, he is permitted to *counteract the prejudicial effect of the adverse testimony* of such witness, by proving that he has made statements on other occasions that are incon-

sistent with his present *adverse evidence.* It never was the purpose of this statute to allow a party to put up a witness for the purpose of endeavoring to get from him *beneficial* evidence, and upon his simple failure to testify to the desired facts, to permit him to get the benefit of those *expected facts,* as substantive evidence through the mouth of another witness, under the guise of *impeachment.* Evidence adduced in this manner is nothing more than the veriest hearsay, and is inadmissible. Even where a witness is properly impeached by proof of *conflicting statements* made on other occasions, the conflicting statements as made to and detailed by the *impeaching witness* should not be considered as substantive evidence in sustenance of the party's cause who produced the impeached witness; but has weight only *for the purpose of counteracting or annulling the harmful effects of the adverse testimony in the cause given by the impeached witness that is inconnsistent with his statements* testified to have been made on other occasions.''

The witness sought to be impeached in this case had not proved adverse, in the sense in which that term is used in the statute, which is a necessary predicate for impeachment. The evidence may not have been what was expected; it was negative in character and was not prejudicial to the State. The effort to impeach him was, under the circumstances, improper. The proceeding tended strongly to discredit the defendant and was therefore harmful. For this reason I concur in the reversal.