352 So.2d 1221 (1977)
Leon ELLIS, McKenzie Tank Lines, Inc., a Florida Corporation, and Carriers Insurance Company, a Foreign Corporation, Etc., Appellants,
v.
GOLCONDA CORPORATION a/k/a Bastian and Blessing, a Corporation, Appellee.
McKENZIE TANK LINES, INC., etc., et al., Appellants,
v.
COLEMAN'S MUSIC AND GAMES CO., INC., etc., Appellee.
McKENZIE TANK LINES, INC., etc., et al., Appellants,
v.
Sallie PETERSON et ux., Appellees.
McKENZIE TANK LINES, INC., etc., et al., Appellants,
v.
Sharon Margaret NOTAGE, etc., et al., Appellees.
McKENZIE TANK LINES, INC., etc., et al., Appellants,
v.
Harris R. LAMBE, et ux., Appellees.
Nos. CC-47 to CC-51.
District Court of Appeal of Florida, First District.
November 29, 1977.
Rehearing Denied December 30, 1977.
*1222 Raymond A. Haas of Haas & Boehm, Daytona Beach, and Sam Spector, Tallahassee, for appellants.
Gary H. Rushmer of Akerman, Senterfitt & Eidson, Orlando, Thomas R. Hess of Ossinsky & Krol, and Wesley A. Fink of Fink & Loucks, Daytona Beach, for appellees.
*1223 RAWLS, Acting Chief Judge.
This case involves an explosion of liquid petroleum gas which escaped from a tank truck owned by McKenzie Tank Lines, Inc., in a semi-residential area in Holly Hill, Florida. While transferring the gas from the tank truck to a bulk storage plant,[1] Leon Ellis, a truck driver for McKenzie, lost control of the liquid hose line connecting the two tanks, resulting in the hose whipping about due to the force of the escaping gas and temporarily blinding Ellis. There are two versions as to the next occurrence: 1) Ellis either ran in an effort to procure help from a police officer, or 2) as he ran from the scene he was spotted by a police officer. Apparently, the jury believed the latter version. In any event, Officer Boccuzzi talked to Ellis and immediately radioed for fire equipment, gas masks, and requested Florida Power to cut off its electricity. Boccuzzi, possibly with the assistance of Ellis, began evacuating residents of the area. Also, Boccuzzi attempted to stop a Florida East Coast Railway train from entering the area. Meanwhile, the liquid propane gas vapors concentrated and accumulated in the general area encompassing one to two blocks. The Florida East Coast train finally came to a halt after the engine had penetrated the gas cloud. After an exchange of words over the noise of the running locomotive engine, the train proceeded through the gas cloud. Boom!! The gas exploded within a close time frame of the train emerging from the gas cloud. Approximately ten minutes after the gas began escaping, Lorenzo Oliver, service manager for Florida Bottle Gas and a 24-carat hero, walked up to the burning truck and closed the ball valve, thus shutting off the gas resulting in the fire going out. As a result of the gas explosion, the following suits were filed:
Plaintiffs Petersons and Lambes sued McKenzie, Ellis, Carriers Insurance Company, and Florida Bottle Gas, Inc.
Plaintiffs Notage and Coleman's Music and Games Co., Inc., sued McKenzie, Ellis, Carriers, Florida Bottle Gas and Florida East Coast Railway.
McKenzie, Ellis and Carriers brought a third party complaint against Golconda Corporation seeking contribution and/or indemnification.
In addition to the actions here considered, appellants advise in their brief that some 120 claims, including approximately twelve other lawsuits, are pending as a result of the explosion.
The suits now reviewed were consolidated for trial resulting in jury verdicts against the appellants alone for a total of $121,459.78 compensatory damages and the additional sum of $70,000.00 for punitive damages. A verdict was rendered against appellants and in favor of Golconda Corporation on appellants' third party complaint for contribution; the trial court having entered a directed verdict eliminating claims for indemnification filed by Golconda and appellants against one another. Appellants (hereafter referred to as McKenzie) now seek review of the final judgment in favor of Golconda; the punitive damages awarded in all the cases; and certain compensatory damages awarded to Notage. The five cases appealed were consolidated by order of this court.

Golconda
The tank truck involved in this incident was equipped with an internal Rego Flowmatic valve designed, purchased and installed for the purpose of providing an automatic cutoff of liquid propane gas flow in the event of accidental escape of quantities of gas through the line. When a pump is activated, the Rego valve, which operates on a differential pressure principle, allows gas to flow from the tanker to the last outpost on the tanker, a ball valve. The Rego valve had been incorporated in the subject tank truck at the time appellant McKenzie purchased the tanker in 1965. *1224 Maintenance records of McKenzie reflected that the Rego valve had been removed at least five times. Other evidence as to the Rego valve reflected that McKenzie's drivers oftentimes tied the Rego valves open in order to expedite the unloading of gas. This practice would result in overriding the safety function of the Rego valve. There was no direct evidence that Ellis, the driver of the truck, manually overrode the Rego valve in the instant case.
In asserting liability on Golconda's part, McKenzie sought to proffer tests, designs and comparisons of a second and newer Rego valve which had been manufactured after the date the subject Rego valve was installed. McKenzie sought to introduce the second Rego valve, together with comparative tests, to prove that it was manufactured to correct alleged defects inherent in the valve being utilized. The trial court denied a formal proffer, however, this record discloses an adequate proffer upon which to review the trial court's denial which was founded upon the lack of relevancy. McKenzie had ownership and control of the valve from 1965 until the date of the accident on January 4, 1974. Changes to the newer Rego valve were designed and incorporated into the manufacture of same in 1968 based upon modern technology that was not available in 1965. Generally, evidence of a change in conditions or proof of repairs made after an injury is never admissible as proof of defendant's negligence. City of Niceville v. Hardy, 160 So.2d 535 (Fla. 1st DCA 1964); Mahoney v. Roper Wright Manufacturing Company, Inc., 490 F.2d 229 (7th Cir.1973); and Smyth v. Upjohn Co., 529 F.2d 803 (2nd Cir.1975). No competent proof was adduced or proffered by McKenzie that the Rego valve was in a defective condition when it purchased the tank truck in the year 1965. To the contrary, the Rego valve was utilized for some nine years, and during this period was oftentimes maintained and repaired by McKenzie. See Second Restatement of Torts, § 402A (1965); Annot., 13 A.L.R.3d 1057 (1967). At minimum, plaintiff, in a product liability case involving long passage of time between manufacture and injury, is required to produce evidence that the product was defective when it left defendant's hand. Strict liability in tort does not connote liability without fault. That the manufacturer subsequently improved the product it placed in commerce with new materials and technology is not an evidentiary fact ipso facto to infer negligence in the manufacture of the original product. The trial court correctly held that McKenzie's proffer of tests, designs and comparisons of the second Rego valve was not relevant to the issue and thus not admissible.
As to Golconda, McKenzie next asserts that the trial court erred in failing to give a charge to the jury, as requested, upon Golconda's failure to properly instruct, train or warn it concerning the usage of the Rego valve. Although McKenzie, by its brief, advises that it presented to the court a form instruction permitting the jury to consider this issue, we do not find such instruction in this voluminous record. Golconda vividly calls such omission to our attention to which McKenzie responds that the record reflects the following short colloquy with the court wherein McKenzie advised: "We also would like to note for the record the court not instruction [sic] on Golconda's negligence  failure to warn." The trial court responded that sufficient instructions had been given. Florida Rule of Civil Procedure 1.470(b)[2] requires that a party's requests for jury instructions must be in writing and submitted to the court. 32 Fla.Jur., Trial § 145. Further, we have *1225 reviewed the instructions given by the trial court, and in our opinion such amply covered McKenzie's claim against Golconda.

Did the Trial Court Err in Permitting Notage and Coleman to Amend 
During Trial and Claim Punitive Damages?
Plaintiffs Petersons and Lambes initially prayed for punitive damages. Coleman's Music and Games Co., Inc., and the Notage cases were consolidated and thus became the first of the "gas explosion cases" to proceed to trial. McKenzie was on notice from the outset that the Petersons and Lambes were seeking punitive damages and that it would have to defend these claims. Under these circumstances, pursuant to the provisions of Fla.Rule of Civ.P. 1.190, the trial court permitted Coleman's and Notage to amend their pleadings praying for punitive damages during the course of the trial. The trial court did not err in permitting the amendments. Turner v. Trade-Mor, Inc., 252 So.2d 383 (Fla. 4th DCA 1971).

Punitive Damages
Punitive damages are generally defined as damages which are given as an enhancement of compensatory damages because of the wanton, reckless, malicious or oppressive character of the acts complained of. 22 Am.Jur.2d, Damages § 236. The terms "punitive" and "vindictive" damages are used interchangeably. Murphy v. Hobbs, 7 Colo. 541, 5 P. 119 (1884). Exemplary or punitive damages are assessable dependent upon circumstances showing moral turpitude or atrocity in causing an injury that is wanton and malicious or gross and outrageous. Jacksonville Frosted Foods, Inc. v. Haigler, 224 So.2d 437 (Fla. 1st DCA 1969); Cannon v. State, 91 Fla. 214, 107 So. 360 (1926). As a general rule, punitive damages have been awarded where there was an intentional violation of someone's rights. Buie v. Barnett First Nat. Bank of Jacksonville, 266 So.2d 657 (Fla. 1972) (wrongful repossession of a car); Levine v. Knowles, 197 So.2d 329 (Fla. 3rd DCA 1967) (malicious destruction of a pet dog); and Adams v. Whitfield, 290 So.2d 49 (Fla. 1974) (malicious prosecution). Punitive damages have been awarded for those negligent acts exceeding that of gross negligence which are of such a flagrant character, or which show wantonness or recklessness, or a grossly careless disregard of the safety and welfare of the public, or that reckless indifference to the rights of others which are equivalent to an intentional violation of them. Cannon v. State, supra; Carter v. Lake Wales Hospital Association, 213 So.2d 898 (Fla. 2nd DCA 1968).
During the course of trial, evidence was presented supporting negligent acts of McKenzie in the following respects: 1) The ball valve on this particular tanker had been replaced 10 days prior to the accident, and at this time McKenzie's terminal manager was well aware that the Rego safety valve was not functioning properly. Nevertheless, the terminal manager kept the tanker in service. 2) By circumstantial evidence, Ellis, the tank truck driver, manually overrode the Rego valve prior to hooking up the tanker lines with the storage tank; and 3) Ellis ran when the large volume of gas escaped without attempting to shut off the ball valve. Obviously, such acts of negligence were sufficient to support the jury's verdict as to McKenzie's liability for compensatory damages, and such is not here questioned. But, do such acts constitute a lawful basis for the award of punitive damages? We conclude that they do not. McKenzie defended keeping the tank truck in service with knowledge of the prior trouble with the Rego valve, because: 1) had it taken the tank truck out of service on this date, it occurring in the middle of winter, a lot of people would have been out of gas; 2) the ball valve was functioning properly after being replaced 10 days before the accident and was adequate in and of itself to retain the gas; and 3) the truck had transported many loads of gas during the 10-day period without incident. The evidence in this case does not raise to the level of that wanton, reckless, malicious or oppressive character to support the award of punitive or vindictive damages.

*1226 Whether the Trial Court Erred in Denying McKenzie's Motion for a Directed Verdict as to the Claims of Sharon Notage, Individually and as Administratrix of the Estate of Jean Marie Notage?
Jean Marie Notage and her daughter lived approximately 200 yards from the site of the escaping gas and subsequent explosion. Sharon, the daughter, testified that in the early morning of January 4, 1974, she was awakened by "a whizzing noise"; that her mother went out the back door and, upon her return in about three to five minutes, she was coughing. The two of them exited their apartment into a mass of white fog which smelled like a gas oven, and, upon entering their car, Sharon noticed that her mother was breathing heavily. As they drove away, her mother "kept on coughing". The record further reflects that Jean Marie Notage's physical condition worsened; her symptoms being coughing, wheezing, nervousness, elevated blood pressure and general debilitation. On June 17, 1974, Jean Marie Notage died as a result of a peripheral vascular collapse due to a ruptured dissecting aneurism of the thoracic aorta.
McKenzie contends that no causal connection has been established as to Jean Marie's inhalation of L.P. gas fumes on the morning of January 4, 1974, and her death some five months later. An osteopathic physician and surgeon testified that Jean Marie, a Christian Scientist who hadn't "done much doctoring", first visited his office on September 13, 1973, and, as a result of examination, the doctor diagnosed her condition as a "bronchitis and in all probability a pleurisy in the lower right quadrant of the chest". Mrs. Notage next visited the doctor on December 17, 1973, at which time he noted that she was still coughing. Some four months after the accident, Mrs. Notage again visited the doctor, and at this time he found that her condition was such that she needed hospitalization, which she declined. The treating physician opined that Mrs. Notage was suffering from bronchial asthma, and that her respiratory problems were causally related to the inhalation of the gas fumes on January 4, 1974. This treating physician was of the view that the inhalation of the gas was a causative effect as to Mrs. Notage's difficulty in breathing; that the difficulty in breathing, coupled with the emotional stress that goes along with difficulty in breathing, almost invariably raises the blood pressure; by raising the blood pressure there was an additional strain on the circulatory system, and in this manner contributed to the aneurism that caused her death. To some extent, the treating physician's testimony was supported by other expert physicians. McKenzie contends that the missing link in this chain of events is the failure to prove any degree of toxicity in the gas, and that each of the experts predicated their opinions upon the assumption that the gas was toxic. We might well term the extensive medical testimony as a "battle of the experts", and although the testimony, as a whole, is rather tenuous in establishing a causative relationship between Mrs. Notage's death by reason of a ruptured aneurism some five months after being exposed to the gas some three to five minutes, it is not our prerogative to sit in the jury box and substitute our views for that of a jury. There was sufficient evidence upon which the jury could and did render its verdict that the gas incident aggravated Mrs. Notage's respiratory problems, and thus contributed to her demise.

Whether the Court Erred in Allowing the Jury to Determine the Issue of "Dependency" and to Project Same Over the Possible Life Expectancy of the Deceased, Jean Marie Notage?
At the time of her mother's death, Sharon Notage was 23 years of age. She testified that she and her mother were very close; that her mother had paid the rent on their apartment; made clothes for her; owned the family car and chauffeured her around because she did not have a driver's license. It was basically upon these facts that Sharon successfully contended in the trial court that pursuant to the provisions of Section 768.18, Florida Statutes, she was "partly ... dependent on the decedent *1227 for support or services". Other facts are significant. Sharon had two jobs, worked seven days a week, and gave money to her mother to help pay for food and rent. From the date of the accident until her mother's death, Sharon looked after her mother, paid all expenses for their apartment, and in her words: "... I started doing everything." Prior to her mother's death, Sharon deposited most of the money she earned in a joint savings account which was in the joint names of the two. No suggestion of Sharon suffering any physical or mental infirmity appears in this record. "Dependency" is not as the trial judge defined: "Whether she [Sharon] was dependent is a fact for the jury to say she was being deprived of something." Hopefully, every child and parent will enjoy a close relationship and contribute "something" to each other. However, once a child reaches the age of majority, a metamorphosis occurs and such child attains the privileges and responsibilities of an adult citizen. This record reflects that if any "dependency" existed between this daughter and mother, the mother was partially dependent upon the daughter.

Whether the Court Erred in Allowing the Jury to Consider an Award to the Plaintiff of Monies for Loss of Net Accumulations of the Estate?
An eminent economist, Professor Ralph Bludgett of the University of Florida, in response to a hypothetical question as to loss of net accumulations to the estate of Mrs. Notage, opined that decedent, had she been an average saver, would have accumulated an estate of present day value of $6,450.00 had she lived out her life expectancy. He arrived at this conclusion by assuming that Mrs. Notage, as an average saver, would have put aside 6 1/2 percent of personal income per year. The professor, in arriving at this conclusion, did not take into account any past history of Mrs. Notage as an "average saver"; had not the "remotest idea" of what two women would spend for food; the issue of two women supporting themselves (the hypothetical being that Mrs. Notage paid all bills) on $4,000.00 per year was an issue not considered by him; he did not know the local cost of insuring an automobile; and made no allowance for rent. Sharon testified that decedent saved no money. The record reflects that decedent earned $1,466.00 gross income in 1973 and $3,866.00 gross income in 1974. There just is not any record basis for an award for loss of net accumulations of this prospective estate. A jury verdict must rest on real substance. Cudahy Packing Company v. Ellis, 105 Fla. 186, 140 So. 918 (1932).
Sharon Notage, individually and as administratrix of Mrs. Notage's estate, cross assigned as error the trial court's granting of a remittitur as to the jury awards for loss of certain personal property. This remittitur reduced Sharon's verdict from $1,850.00 to $800.00 and the estate's verdict from $8,000.00 to $4,000.00. The record supports the order of the trial court in granting the remittitur; however, the trial court did not grant the Notages the option of accepting the remittitur or the alternative of a new trial. A trial court is not permitted to reduce the verdict of a jury by ordering a remittitur without permitting the plaintiffs to have the option of a new trial. Dura Corporation v. Wallace, 297 So.2d 619 (Fla. 4th DCA 1974).
We have carefully considered the other two assignments of error  form of verdict and counsel's prejudicial remarks  and find them to be without substantial merit.
The judgments are affirmed:
1. As to third party defendant Golconda upon McKenzie's third party claim.
2. As to the compensatory damages awarded Coleman's Music and Games Co., Inc.
3. As to the compensatory damages awarded to Sallie Peterson, et ux., and Harris R. Lambe, et ux.
4. As to the Notages:
a. Sharon Notage's award of $800.00 and the estate's award of $4,000.00 for loss of personal property without prejudice to their demand for a new trial solely confined *1228 to these awards, and upon such timely demand the trial court is directed to grant a new trial.
b. As to compensatory damages to the estate in the sum of $2,057.10 for loss of earnings and medical expenses, and $1,882.50 for funeral expenses.
The judgments appealed are reversed:
1. As to punitive damages awarded to all parties.
2. As to the award of damages to Sharon Notage, as sole survivor of Jean Marie Notage, for loss of support and services ($5,000.00).
3. As to the award of damages ($4,000.00) to Sharon Notage, as administratrix, for loss of net accumulations to the estate of Jean Marie Notage.
4. As to the award of damages ($10,000.00) to Sharon Notage, as administratrix and sole survivor, for mental pain and suffering.
IT IS SO ORDERED.
BOYER, J., concurs.
ERVIN, J., concurs in part, dissents in part.
ERVIN, Judge, concurring and dissenting.
I concur in this court's majority opinion except as to that portion which reverses punitive damages. The tank truck involved was equipped with two valves, one a ball valve on the outside of the truck, which permitted the driver to open and release the gas; the second a Rego valve, a safety valve designed to close whenever gas was escaping into the atmosphere. Its intended purpose was to stay in a closed position at all times until the power operated pump on the truck was engaged, resulting in the transfer of gas, at which time a differential in pressure caused the safety valve to open and in the event of any difficulties, it was designed to close automatically. Ten days prior to the accident, the company had repaired the ball valve and it was in apparently good working order just before the accident. However, the Rego valve was not operating correctly, a fact which the terminal manager became aware of during repairs to the ball valve. He stated that during the repairs, it was necessary for him to "burn down" all excess gas which was leaking from the Rego valve before he could work on the ball valve. Nevertheless he allowed the truck with the defective safety valve to continue in operation after he had contacted the corporate headquarters in Tallahassee and was told no other tankers were available. He testified the Rego valves never worked anyway so he did not see the need for replacing them. Because the Rego valve impeded the flow of gas from the tanker truck, there was testimony that some of the drivers had tied the safety valve open, although the driver of the tanker specifically denied having done so.
The operations manager for the tank lines testified he warned drivers against doing this. Moreover the manufacturer's instructions had warned that if the safety valve became defective, it should be immediately repaired or replaced. Nevertheless the terminal manager himself stated he tied Rego valves open with a piece of string. Moreover each truck was equipped with a wrench so that in an emergency the Rego valve could be wrenched open or closed.
There was evidence that notwithstanding the driver's testimony he had not opened the Rego valve, the leakage of approximately 120 gallons of gas per minute could not have occurred unless the valve had been manually forced open. As a consequence the jury had presented to it two alternative theories on which an award of punitive damages could be based: 1. That despite his employer's explicit instructions not to open the Rego valve, the employee willfully and obstinately disregarded those instructions in a grossly careless disregard of the safety of others and in fact had opened the valve at some time prior to the accident. 2. That the Rego valve was in a defective condition, which the driver's employers were aware of at least 10 days prior to the accident, yet willfully disregarded the risks attendant to an inherently dangerous substance *1229 and permitted the tanker to resume service despite instructions from the manufacturer that upon notice of such defect the valve be repaired or replaced immediately.
The degree of negligence necessary to support an award of punitive damages is the same as would support a conviction of manslaughter under the culpable negligence statute. Mills v. Cone Brothers Contracting Company, 265 So.2d 739 (Fla. 2nd DCA 1972). Under such test it is necessary for the plaintiff to present proof that the conduct of McKenzie's employee was such as to evince a reckless disregard of human life or to display that want of care which would raise the presumption of conscious indifference to consequences, or a grossly careless disregard of the safety and welfare of the public, equivalent to an intentional violation of their rights. Mills v. Cone Brothers Contracting Company, supra, at 740. Additionally, if there is any evidence tending to show that punitive damages might be inflicted, even if the court is of the opinion that the preponderance of the evidence is the other way, the court should leave the question to the jury. Doral Country Club, Inc. v. Lindgren Plumbing Co., 175 So.2d 570 (Fla. 3rd DCA 1965).
The fact that punitive damages were assessed against McKenzie Tank Lines, Inc., the corporate employer, matters not. "The general rule, and the weight of authority is that in ordinary cases the allowance of exemplary damages applies equally in a suit against a corporation as in a suit against a natural person." Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214, 220 (1936). Florida has traditionally followed the rule that a corporation may be held liable for exemplary damages for acts done by employees acting within the scope of their employment as would, if done by an individual himself, render him liable for damages.[1]Winn & Lovett Grocery Co., supra.
If the record only contained evidence of Ellis' negligence in the transfer of the gas from the tanker to the storage plant, I would agree with the majority the evidence did not rise to the level necessary to support the award of punitive damages. But the record is clear that had the safety valve been in proper working order, the accident could not have occurred. The open Rego valve was thus a concurring cause of the injury. McKenzie is liable for damages which are partly the result of other causes if the other cause alone would not have been sufficient to produce the injury. Hamilton v. Walker Chemical & Exterminating Co., 233 So.2d 440 (Fla. 4th DCA 1970). This additional evidence in my opinion was sufficient for a jury to determine the appropriateness of an award of punitive damages.
NOTES
[1] The bulk storage plant was owned by Florida Bottle Gas, Inc., which was a defendant in the various suits. Approximately one week before trial, Florida Bottle Gas was severed due to the illness of an expert witness.
[2] Fla.R.Civ.P. 1.470(b) provides:

"(b) Instructions to Jury. Not later than at the close of the evidence, the parties shall file written requests that the court charge the jury on the law set forth in such requests. The court shall then require counsel to appear before it to settle the charges to be given. At such conference all objections shall be made and ruled upon and the court shall inform counsel of such general charges as it will give. No party may assign as error the giving of any charge unless he objects thereto at such time or the failure to give any charge unless he requested the same. The court shall charge the jury after the arguments are completed."
[1] Recently, however, our court seems to have adopted an exception to the majority rule. In Alexander v. Alterman Transport Lines, 350 So.2d 1128 (Fla. 1st DCA 1977), the court held that before a corporate employer could be subjected to punitive damages resulting from the alleged grossly flagrant negligent actions of its employees, acting within the scope of their employment, there must be some knowledge by the employer of the employee's actions. The opinion appears in conflict with Winn & Lovett Grocery Co. v. Archer, supra, as well as the weight of authority to the contrary. The theory supporting the majority view is

"... that the doctrine of exemplary damages is especially applicable in cases where corporations are sued for the actions of their employees, and that since a corporation can act only through its agents and employees, no reasonable distinction can be made between the guilt of the employee and the guilt of the corporation, the malice of the employee and the malice of the corporation, or the punishment of the employee and the punishment of the corporation, and that if authorization or ratification were required, no recovery for more than compensatory damages could ever be had against the corporation for the acts of its agents or employees." 22 Am.Jur.2d, Damages, Section 261 (1965).