## MARIO HERNANDEZ, v. STATE OF FLORIDA

22 So. (2nd) 781          January Term, 1945
April 20, 1945          En Banc
On hearing July 13, 1945. Further rehearing denied July 30, 1945.

*William C. Pierce* and *Woodrow M. Melvin,* for appellant.

*J. Tom Watson,* Attorney General, and *John C. Wynn,* Assistant Attorney General, for appellee.

PER CURIAM:

Affirmed.

TERRELL, BUFORD, THOMAS and SEBRING, JJ., concur.

CHAPMAN, C. J., BROWN and ADAMS, JJ., dissent.

ON REHEARING GRANTED

*William C. Pierce* and *Woodrow M. Melvin,* for appellant.

*J. Tom Watson,* Attorney General, and *John C. Wynn,* Assistant Attorney General, for Appellee.

BROWN, J.:

Appellant was indicted for the first degree murder of Frank Zatarain. He was convicted by a jury of murder in the second degree, and from the judgment and sentence imposed by the Court this appeal was taken.

The record shows that appellant's daughter, Alice Zatarain, a young woman twenty two years of age, was the wife of Frank Zatarain. They had two children, a son three and a half years old and a baby daughter about two years old. While all the parties lived in Tampa, Mario Hernandez lived some distance away from the apartment occupied by his daughter and her husband. Alice Zatarain testified that for a considerable period of time Frank Zatarain had been very abusive and cruel to her and on many occasions had beaten her and threatened her life, and on one recent occasion had threatened to kill their little daughter. Mario Hernandez testified that he had done all that he could do to help them and to maintain peace in the family and had frequently advanced money to Frank but that he knew that his daughter was having a very hard time of it. Alice testified that shortly before this tragedy, Frank had been drinking and gambling and had been unusually violent toward her every night for three nights preceding a trip he made to Key West to find work, which trip she had suggested and had asked a friend to lend him the money with which to make the trip; that Frank's violent treatment of her at night made it very difficult for her to do her work and hold a job she had been compelled to take. He returned in two or three days and when she went home from her work in the late afternoon of Thursday, January 14th, she found Frank there. He had evidently been drinking and was very abusive. She told him that she still loved him but that she could never live with him any more, and that brought on more trouble. He left the apartment stating that he was going to fix it so that she could put him in jail; that he was going after some whiskey. She left the apartment carrying her little boy with her and went to Frank's mother's house to get their little girl. Then she started to a nearby store, whereupon she met Frank and told him that she was leaving. She went to the store and called a taxi cab. While she was doing this Frank came up and took the little girl away from her and showed his wife a knife that he was holding in his hand. She saw that her husband was drinking and became frightened and told him that she would get the police or her father to get the baby. Frank replied that if she did so he

would cut her father's throat and the baby's throat. Alice then took her little boy and went immediately to her father's home. It was then about 9:30. She told him what had taken place and begged him to get her baby for her. At her father's home at the time there was an elderly gentleman, by the name of Rodriguez, and Peter Balmaceda, an old friend of her father. Her mother was in the bed room with her baby sister. She and her father went back in the kitchen and she told him everything that had happened; that Frank had come home and that he was drinking; that he had a knife and that he would not give back the baby girl. Then she asked her father to go and get the baby, that she was pretty sure Frank was going to hurt her. She testified that she was very nervous, could hardly stand and was crying. She then testified that her father told her, "You and Frank have had a lot of trouble, but that is all right. If I come and fix things for you to go back to Frank," to which she interjected "I would not go back to Frank at all." Then her father said "Well, Alice, you stay here and I will go get your baby girl. I will fix up everything for you." She testified that she was too nervous to go with him and stayed in the living room, and Mr. Balmaceda went with him to West Tampa to get the baby.

It was when they had reached Frank's apartment and the appellant had gone up to the top of the stairs, leading to the floor where Frank's apartment was, that Frank came out of a nearby door, and the altercation occurred in which the appellant stabbed Frank Zatarain with a knife, which wound was so deep and serious as to cause his death. He testified that he had picked up the knife, which was a pocket knife, at his house as he left and put it in his outside overcoat pocket.

The only eye witnesses to this tragedy were Balmaceda and the defendant himself. The State placed Balmaceda on the stand and after a few preliminary questions the following is disclosed by the record.

"Q. Was Mario angry or mad?

"A. He looked like he lost his head.

"Q. Say he looked like he lost his head?

"A. Yes, sir.

"Q. What did he say, if anything there, to you, he was going to do when he got over to West Tampa?

"A. Well, at present when he was going to West Tampa, he was excited and everything like that. I can't remember much about what he said when he was going down to West Tampa.

"Q. Now let's get this straight, Mr. Balmaceda, you testified the next day before Mr. Umstot, didn't you?

"A. Yes, sir.

"Q. That was the next day while it was fresh in your mind?

"A. Well, it may be that my mind was not refreshed so much.

"Q. I will ask you then if you didn't testify to Mr. Umstot and if you didn't testify before the Grand Jury what he said there at the house before he left, as to what he was going over to West Tampa to do after he got there?

"By Mr. Pierce: I object to that on the ground that it is an attempt to cross-examine the State's own witness. It is an attmpt to impeach the State's own witness.

"By the Court: Objection overruled.

"By Mr. Farrior: I just want to get this straight now. This witness has taken the stand and keeps talking about what a good friend he is to the defendant.

"By Mr. Pierce: I object to arguing that before the jury.

"By Mr. Farrior: I am taken by surprise and I want to cross-examine this witness as to what he stated the next day and before the Grand Jury, if he didn't testify certain things at that time.

"By Mr. Pierce: Objected to on the ground that the proper predicate has not been laid.

"By Mr. Farrior: I will withdraw the question.

"Q. Mr. Balmaceda, I want you to tell this jury what if anything Mr. Hernandez said there at the house before he left as to where he was going and what he was going to do?

"By Mr. Pierce: I object to that on the ground that it is repetition. The witness has already answered that he didn't remember.

"By the Court: I will let him answer it and clear it up.

"A. When he left there he said, well, I can't remember exactly. I know I said it. The condition I was, I must have been excited or nervous and something like that. He said 'He will kill me or I will kill him.' see? That is the words he said, but I don't know in the condition I was what it was he said there or at the other house, because I must have been confused. In one house or the other.

"By Mr. Farrior: Q. Are you now trying to apologize to the jury for what you said at that time?

"By Mr. Pierce: I object to his accusing his own witness that he is trying to apologize to the jury. Mr. Farrior put him on and he vouches for him.

"By Mr. Farrior: He perjured himself then or now, and if he has perjured himself we want to know it. We are not going to be indicting people and trying them on perjured testimony, and we want to know from this witness what happened that night truthfully, and I ask to proceed with the examination of the witness.

"Mr. Pierce: I am perfectly willing that all the facts be gone into, but I think it is unfair to the defendant on trial for the State Attorney, in the presence of the jury to accuse or impute to the said witness, whom the State Attorney has had in his office all morning, to put him on the stand and impute to him that he is trying to apologize to the jury.

"Mr. Farrior: I think his appearance shows he is a very hostile witness and I think I have the right to proceed.

"By the Court: Go ahead."

Counsel for the defendant, a bit later, the jury having retired on order of the Court, interposed a motion that the Court declare a mistrial, basing his motion upon the above quoted statements made by the State Attorney with reference to perjury, and being taken by surprise by the testimony of the witness, which witness had given no testimony unfavor-

able to the State. This motion was denied, and the taking of testimony resumed.

The witness, a little later, on cross examination, denied that the defendant had made such a statement, as that he had been asked about, on the street car trip to West Tampa, but stated that he did make it shortly after he met the deceased at the top of the stairs, and after some words were passed that witness did not hear, and after the deceased had said, "Lets have it out in the street."

Later on, counsel for the State introduced the testimony of the stenographer who had taken down the sworn testimony of the witness when he was questioned by the Assistant State Attorney, or rather that part of it (some six questions and answers) which were contradictory, in part at least, to witness' testimony on the stand. One of these questions and answers was: "All the time you were riding on the street car you were trying to persuade Mario not to get in trouble, but he said he was going there for trouble, and he was going to kill him, or Frank was going to kill him?" Answer: "Yes, sir." And another was: "And just before he stabbed Frank, he said 'I am going to kill you or you are going to kill me' and Frank said, "Lets go to it?" Answer: "Yes, sir." The introduction of all such testimony was objected to by defendant's counsel on various grounds, one of which was that the State could not base its case on the testimony of an impeaching witness.

On cross examination the stenographer stated that the six questions and answers he had testified to were a few isolated questions here and there in his notes, and that all the questions and answers were not given. When counsel for defendant tried to question the stenographer as to other questions and answers, which he told the court would explain or neutralize the particular questions and answers introduced by the State, counsel for the State objected and the Court sustained the objection. We consider that in so ruling the learned trial judge was in error.

Counsel for the defendant then proffered to prove by said stenographer that the witness Balmaceda, in answer to one of the questions asked him during said examination by the As-

sistant State Attorney, bearing on the question of whether or not there was anything said about "you kill me or I kill you" at the house before they got to West Tampa, answered:

"Mario came out from his room and he told the other old man, Rodriguez, to go with him and Rodriguez would not go and he said 'You have been an old friend of mine and I want you to go to West Tampa.' That is what his words were.

"Question: 'Did you go?'

"Answer: 'Yes, sir.'

"And then the following question, 'What did he tell you he was going to do?'

"Answer: 'He didn't say what he was going to do.'"

This proffer was not accepted, and the trial proceeded. In the case of Brown et al. v. State, 152 Fla. 698, 13 So. (2nd) 3, the only eye witness to the homicide there involved, having testified in chief, was cross examined concerning certain testimony given by him at the coroner's inquest, by reading to the witness fragmentary portions of the testimony that he was supposed to have given and asking him the usual questions as to whether or not he had given such testimony. The witness admitted giving some of the answers, others he admitted having given in substance, and still others he flatly denied making. For the purpose of impeaching the witness, the defendants introduced a transcript of the questions and answers as to which he had been interrogated on cross examination, and also other portions of the sworn testimony given in connection therewith. On rebuttal the state attorney was allowed to place before the jury all the testimony given by the witness at the coroner's inquest. The refusal of the trial court to exclude this rebuttal evidence was assigned as error. In that case this court speaking through Mr. Justice SEBRING, said:

"There was no error in the lower court's ruling. When a witness is sought to be impeached by the introduction of a fragmentary portion of a sworn statement made by him at a former hearing, the other party may then introduce the whole statement, so far as it is connected with, or explanatory of the part previously introduced, and tends to give a clearer picture

of what the witness actually said on the prior occasion than does the fragmentary portion.

"(Citing authorities.)

"Of course, this is not to say that the whole testimony is admissible if it is not revelant or material to the precise matter on which the witness has been interrogated, or if its only purpose is to corroborate, or bolster, the testimony, presently given by a witness, by reading into evidence a statement made by him at a former hearing. But where, as in this case, the whole statement deals directly with but the one subject matter as to which the witness was sought to be impeached, and is connected therewith and explanatory thereof, it is permissible to admit it in its entirety to show the true meaning of the fragmentary portions as to which the witness was interrogated, and to give the jury the benefit of the entire substance of what was said by him at the former hearing."

See in this connection Padgett v. State, 64 Fla. 389, 59 So. 946; And State ex rel Brown v. Dewell, 123 Fla. 785, 167 So. 687.

Section 90.09 F.S. 1941, which was section 1101 Rev. Statutes of 1892, reads as follows:

"90.09. Impeachment of Witness by Party Producing.— A party producing a witness shall not be allowed to impeach his credit by general evidence of bad character but he may, in case the witness prove adverse, contradict him by other evidence, or prove that he has made at other times a statement inconsistent with his present testimony; but before such last mentioned proof can be given, the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, and he must be asked whether or not he made such statement."

It is apparent from the record that the witness Balmaceda, together with the defendant and several other witnesses, had been examined under oath by the Assistant State Attorney late at night on the day after the homicide, and that the questions asked him and the answers given were taken down by a stenographer and later transcribed, and that on this trial the State Attorney had these transcribed notes in his

possession and was of course familiar with their contents. It was but natural when, in the course of examining Balmaceda as a witness for the State, indeed as the State's only eye witness, it developed that such witness was departing in some important particulars from his sworn testimony previously given, that the State Attorney should have been both surprised and indignant. In this situation, the State Attorney had the right to refresh the recollection of the witness by cross examining him as to whether or not he had not made certain statements to the contrary upon his previous examination and thus give the witness an opportunity, with his memory thus refreshed, to return to his original story, or to explain, if he could, the discrepancies, and the reasons, if any, therefor. Rowe v. State, 128 Fla. 394, 174 So. 820. That the witness, a man of 64 years, was an old friend of the defendant, was never at any time denied by him or any other witness, so far as our examination of this record discloses. He admitted or referred to this friendship in the early part of his examination by the State Attorney. We see no harm in that, nor any occasion for surprise. But when he testified that the defendant had said, "He will kill me or I will kill him," "either at one house or the other," he departed to some extent from his previous testimony. Even if this gave the State Attorney the right to treat him as an adverse witness, and to cross examine him and if need be, to contradict his own witness, by showing that he had previously made statements inconsistent with his present testimony, it did not justify the State Attorney to state in the presence of the jury that "He perjured himself then or now, and if he has perjured himself we want to know it." With the great power of the State Attorney's office vested in him by law, this might well have been construed by the witness as a threat that if he did not testify on this trial just as he did upon his previous examination by the Assistant State Attorney, he would be prosecuted for perjury, even though this was not so intended.

Nor was this remark by the able and distinguished State Attorney, no matter how conscientiously made, justified as a matter of law, if it could be construed to imply that the witness was committing perjury in the giving of his testimony

before the jury. Thus, in Freeman v. State, 19 Fla. 552, a perjury case, this Court said:

"There is no evidence to prove which of the two statements is the true one, or which is the false one. 'Where the defendant has made two distinct statements under oath, one directly the reverse of the other, it is not enough to produce the one in evidence to prove the oath to be false.' Wharton Crim. Law, 2275. Other evidence should have been produced to show which statement was the true one and which the false, in order to convict the prisoner. Mr. Bishop in his commentaries on the Criminal Law 1044, says: 'If a witness testified either in two different causes, or in one cause at different examinations, or at one examination, to two opposite things irreconcilable with each other, he commits perjury in making the false statement, but not in making the true one, and though what he said when he told the truth may be shown in evidence against him or an indictment for the falsehood, yet there must be testimony outside of his own contradictory statements as to which of them is false."

This principle was reiterated and followed in Hall v. State, 136 Fla. 644, 187 So. 392.

Nor should we forget the clear interpretation of the meaning and effect of this statute, 90.09 F.S. 1941, as set forth in Adams v. State, 34 Fla. 185, 15 So. 905. In that case Mr. Justice TAYLOR writing the opinion, it was said:

"It is very erroneous to suppose that, under this statute, a party producing a witness is at liberty to impeach him whenever such witness simply fails to testify as he was expected to do, without giving any evidence that is at all *prejudicial* to the party producing him. The impeachment permitted by the statute is only in cases where the witness proves *adverse* to the party producing him. He must not only fail to give the *beneficial* evidence expected of him, but he must become *adverse* by *giving evidence that is prejudicial to the cause of the party producing him.* When a party's witness surprises him by not only failing to testify to the facts expected of him, but by giving *harmful evidence* that is contrary to what was expected, then, as is the purpose of this law, he is permitted to *counteract the prejudicial effect of the*

*adverse testimony* of such witness, by proving that he has made statements on other occasions that are inconsistent with his present *adverse evidence.* It never was the purpose of this statute to allow a party to put up a witness for the purpose of *endeavoring* to get from him *beneficial* evidence, and upon his simple failure to testify to the desired facts, to permit him to get the *benefit* of those *expected facts,* as substantive evidence through the mouth of another witness, under the guise of *impeachment.* Evidence adduced in this manner is nothing more than the veriest hearsay, and is inadmissable. Even where a witness is properly impeached by proof of conflicting statements made on other occasions, the *conflicting statements* as made to and detailed by the *impeaching witness* should not be considered as substantive evidence in sustenance of the party's cause who produce the impeached witness; but has weight only *for the purpose of counteracting or annulling the harmful effects of the adverse testimony in the cause given by the impeached witness that is inconsistent with his statements testified to have been made on other occasions."*

The above case was followed, and to some extent enlarged upon, in Sylvester v. State, 46 Fla. 166, 35 So. 142. It was also followed in Bryan v. State, 45 Fla. 8, 34 So. 243; Sloan v. State, 70 Fla. 216, 70 So. 23; and in Rowe v. State, 128 Fla. 394, 174 So. 820. In the last case cited, the Adams case was adhered to, but it was held that it is permissible, for the purpose of refreshing the recollection of a reluctant or evasive witness, to direct his attention to statements previously made or testimony formerly given by him, when the party calling him is surprised by his testimony. The interpretation of the quoted statute, as given in Adams v. State, *supra,* has never been departed from by this Court, in so far as this writer has been able to ascertain; nor have we departed from the general rule, in cases not covered by the statute, that a party should not be allowed to propound leading questions to his own witness, nor to impeach his own witness.

It is extremely doubtful, under the rules laid down in the quotation from Adams v. State, *supra,* whether the State had the right to prove by the stenographer the questions pro-

pounded and answers given by the witness Balmaceda on his previous examination. True, he had failed to give the evidence beneficial to the State which was expected of him, but he had not given any testimony which was positively prejudicial to the State. It was within the rule to refresh the recollection of the witness by asking him if he had not testified to certain matters before the Assistant State Attorney, but when he denied having given certain portions of such former testimony, then to put the stenographer on the stand and prove that he did so testify, and have him quote from his notes some six questions and answers, thus giving the State the benefit of this testimony as apparently substantive evidence through the mouth of another witness, this was going beyond the rule laid down in the cited case, especially in the absence of some instruction from the Court which would clarify the situation, directing the jury to confine their consideration to the testimony given by the witness on the stand and give to it such weight as they deemed it entitled to in the light of the inconsistent or contradictory statements he had formerly made.

For the errors above pointed out, the judgment appealed from is hereby reversed and the cause remanded.

Reversed.

CHAPMAN, C. J., BUFORD and ADAMS, JJ., concur.

TERRELL, THOMAS and SEBRING, JJ., dissent.