403 So.2d 459 (1981)
AMERICAN MOTORS CORPORATION, Appellant/Cross-Appellee,
v.
William Howard ELLIS, Jr., and William J. St. John, Appellees/Cross-Appellants.
Nos. 80-767, 80-770, 80-1025 and 80-1026.
District Court of Appeal of Florida, Fifth District.
August 12, 1981.
Rehearing Denied September 15, 1981.
*461 James E. Tribble of Blackwell, Walker, Gray, Powers, Flick & Hoehl, Miami, and Sanders, McEwan, Mims & McDonald, Orlando, for appellant/cross-appellee.
David B. King of Peed & King, P.A., Orlando, for appellees/cross-appellants.
COBB, Judge.
American Motors Corporation (AMC), defendant below, appeals from judgments in favor of plaintiffs Ellis and St. John, entered pursuant to jury verdicts. Ellis and St. John have cross-appealed from a directed verdict in favor of AMC on the issue of punitive damages and on various evidentiary rulings made during trial.
On December 10, 1976, Ellis was driving his father's 1974 AMC Ambassador east in the righthand lane of Interstate Highway 4 in Orange County with St. John as a passenger in the front seat. As they came over a hill, Ellis noticed traffic congestion ahead where an entrance ramp merged into the right lane of I-4. Since he planned to exit shortly, Ellis stopped his vehicle in the righthand lane rather than attempting to pass the congestion. At about this time, Gerald Rausch was driving his vehicle on the entrance ramp to I-4. When he saw the traffic congestion, Rausch attempted to by-pass it, cutting directly onto I-4 behind the Ambassador. As he moved a few feet onto I-4, he saw a tractor-trailer coming over the hill toward him. Rausch then veered back into the entrance lane, which at that point ran parallel to the right lane of I-4.
John McGuirt, the driver of the tractor-trailer, which was loaded and weighed about 74,000 pounds, was travelling in the right lane of I-4. As he started down the hill at an estimated speed of 45 to 50 miles per hour, he noticed the traffic congestion ahead and saw Rausch's vehicle heading into the right lane. McGuirt tried to move into the left lane but could not as another vehicle was there. When McGuirt looked back to the road in front of him, he saw that he had passed Rausch's car, but that the Ambassador was directly ahead "sitting in the road." McGuirt applied his brakes *462 and turned sharply to the left. As he was turning, the right front portion of the tractor collided with the left rear of the Ambassador, crushing the rear four-and-one-half feet of the car and propelling it forward for more than one hundred feet. The tractor-trailer continued to veer off to the left, collided with the median barrier and rolled over on its side.
The tractor was fueled by two one-hundred-gallon diesel saddle tanks connected by a fuel line running from one to the other. Each tank was about half full. At some point during the accident, the right tank separated from the tractor-trailer, allowing diesel fuel to escape. After the Ambassador came to rest, a fire started, consuming the vehicle and causing severe burns to Ellis and St. John. The exact point at which the tank separated and whether the fire was caused by the diesel fuel or the gasoline from the ruptured fuel lines of the Ambassador were points in dispute at trial.
Ellis and St. John filed suits against McGuirt and his insurer, and Rausch, his employer and his insurer. Claims against these defendants were later settled. An amended complaint then was filed naming AMC as a defendant. The claims against AMC were based on negligence and strict liability stemming from an allegedly defective design of the Ambassador's gasoline tank and filler system. The asserted defect was that the gasoline tank and filler system were located beneath the trunk floor at the rear of the car, rather than in an upright position in the "kick-up area," which is the space above the rear axle and beneath the package shelf just behind the rear seat. A claim for breach of warranty was voluntarily dismissed at the outset of trial, and a directed verdict was entered in favor of AMC on the plaintiffs' claim for punitive damages.
AMC relied on several theories of defense. It contended the kick-up area was not a preferable location for a gas tank, that AMC's fuel system did not leak as a result of the impact, and that the fire was started as the result of spillage of diesel fuel from the tractor-trailer onto the car, which had caused the gasoline still contained within the tank to ignite. AMC also contended that if there were gasoline leakage, it was the result of a tremendous impact which no reasonably designed fuel system could be expected to withstand.
The first issue appellant raises is whether the trial court's error[1] in refusing to compel disclosure to adverse counsel of a witness statement used by counsel for plaintiffs for cross-examination impeachment constitutes reversible error. We believe that it does under the instant facts. Linda Bates, an eye-witness to the accident, had been listed by the plaintiffs as a potential witness. However, at trial, she was called by AMC and testified that she saw flames on the left side of the crushed vehicle. This testimony lent support to AMC's assertion that the fire was due to spilled diesel fuel from the tractor-trailer. On cross-examination, plaintiffs' counsel attempted to impeach her with a pre-trial statement made to an investigator in the office of plaintiffs' counsel. This statement, which apparently was to the effect that the flames were on the right side of the vehicle, had been protected from discovery by court order under the "work product" doctrine. Counsel for AMC asked to examine the statement; this request was denied by the trial court.
In Dodson v. Persell, 390 So.2d 704 (Fla. 1980), the Florida Supreme Court held that the contents of surveillance films and materials are subject to discovery in every instance where they are intended to be presented at trial, either for substantive, corroborative, or impeachment purposes. In other words, if the materials are only to aid counsel in trying the case, they are "work product," but any "work product" privilege that existed ceases once the materials or testimony are intended for trial use.
*463 Thus, even assuming that the witness' statement was privileged under the work-product doctrine,[2] the privilege ceased once the statement was used as impeachment evidence. As counsel for AMC had not seen the document and was taken by surprise, he should have been given an opportunity to review it, during a trial recess if necessary. See Dodson at 708. This opportunity to examine the statement was necessary as counsel is entitled to read relevant portions of the statement to explain the apparent inconsistency in the witness' testimony at trial. Hernandez v. State, 156 Fla. 356, 22 So.2d 781 (1945); Brown v. State, 152 Fla. 698, 13 So.2d 3 (1943). See also King v. Califano, 183 So.2d 719 (Fla. 1st DCA 1966).
The testimony of the witness Bates, called by AMC, related to a crucially important aspect of AMC's defense: that the fire was caused by spillage of diesel fuel rather than by gasoline.
It was clear error, under the circumstances of this case, for the trial judge to refuse to require plaintiffs' attorney to produce the statement of Bates at trial, regardless of whether it was properly immune from pre-trial discovery as work product. Once the statement was disclosed by plaintiffs' attorney in open court, identified by the witness, and used to impeach her, any prior work product immunity terminated.
In United States v. Nobles, 422 U.S. 225, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975), the court held that in a criminal case the defense attorney was properly required to produce at trial a statement taken by a defense investigator when that statement had already been used to impeach the prosecution witnesses and where the defense counsel announced his intention of calling his investigator to the stand. The work-product privilege was held to have been waived because the defendant could not "advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials... ." Nobles, 422 U.S. at 240, 95 S.Ct. at 2171, 45 L.Ed.2d at 154. The same general principle is recognized under Florida's view of the work-product privilege.
Under the holding of Dodson, it is highly doubtful whether a pre-trial work-product privilege attached to the statement taken from Bates, since the plaintiffs apparently intended to use it at trial for impeachment. That question need not be addressed, however, because it is abundantly clear that if ever there were a valid privilege, it terminated as soon as the statement was actually used at trial for impeachment. At that time, AMC's counsel was unquestionably entitled to have the entire statement produced for his inspection, for his use in redirect examination of Bates, and for possible introduction into evidence.
Under Florida law, where one party reads selected and prejudicial portions of the other party's deposition for impeachment, it is error to prohibit opposing counsel from reading other portions of the same deposition in an effort to demonstrate "that the `whole truth' was that the defendant's trial testimony should not be discredited on account of her testimony at the deposition hearing." King v. Califano. The above rule applies with equal force to statements of a witness other than those contained in depositions. For example, see 98 C.J.S. Witnesses § 622 (1957), stating that:
Where, for impeachment purposes, a portion of a statement previously made by a witness and apparently inconsistent with his present testimony is introduced, the entire statement is admissible in rebuttal.
To similar effect is 98 C.J.S. Witnesses § 422 (1957), stating that where a witness has been cross-examined as to part of a statement, the party calling the witness is entitled on redirect examination to elicit the whole of the statement to the extent that it relates to the same subject matter and concerns the specific matter opened up on cross-examination.
In the instant case, AMC's trial counsel was deprived of an opportunity to conduct a full and fair redirect examination of the witness by using other relevant portions of her pre-trial statement in an effort *464 to demonstrate that her trial testimony should not be discredited. Since plaintiffs' counsel had used the statement in open court and the witness had examined it during her testimony, it was clear error not to require production of the statement to AMC's counsel at that time. The error was prejudicial because it related to the credibility of an eye-witness on a crucial fact issue as to the origin of the fire. In fact, prejudice is inherent in the ruling, because it precluded both AMC's counsel and the trial and appellate courts from knowing the contents of the statement. Cf. Cason v. Smith, 365 So.2d 1042 (Fla. 3d DCA 1978); Musachia v. Terry, 140 So.2d 605 (Fla. 3d DCA 1962).
Counsel for the plaintiffs urges that this error was not properly preserved for appellate review because the defendant did not proffer the statement at trial. This is specious because it is clear that the ruling of the trial court prohibited such a proffer. Defense counsel was not allowed to even see the statement; how, then, could it have been proffered?
AMC also argues that it was error for the trial court to admit, over its objections, evidence of crash testing and resulting design changes in AMC's fuel filler systems, subsequent to the manufacture and sale of the 1974 Ambassador. The plaintiffs offered into evidence the results of automobile crash tests conducted by AMC from 1966-1975. Over AMC's objections, the trial judge ruled that he would not allow the crash test results for the purpose of showing a similarity to the accident in this case, but that he would admit the evidence for the purpose of showing subsequently-acquired knowledge which might impose a duty to warn, and for the purpose of showing feasible design alternatives. Pursuant to this ruling, the court admitted documentary evidence of six crash tests conducted on similar types of AMC vehicles. Only one such test (test 490), a thirty-mile-per-hour rear-end fixed-barrier crash test on January 12, 1971, was conducted prior to the sale of the 1974 Ambassador in question, which was purchased by Mr. Ellis on March 20, 1974. The other tests were after the sale and before the accident. These tests were carried on by AMC for purposes of determining whether its cars would be able to meet various proposed federal government requirements for fuel system integrity under controlled crash conditions, and to determine what modifications needed to be made to meet these requirements.
The trial court also admitted evidence of changes to the fuel filler system in AMC's 1977 models, consisting of modification of the unitized body structure through which the filler neck was routed, the lengthening of a rubber hose connection, and the addition of a "break-away" feature where the filler neck attaches to the body panel. These changes were designed as a result of information obtained from AMC's crash-testing program, and were adopted so that AMC's cars would comply with federal regulations that fuel systems be able to withstand a thirty-mile-per-hour moving-barrier test.
AMC submits that harmful error was committed in admitting the evidence of crash testing, particularly since all but one of the tests were conducted after the manufacture and sale of the 1974 Ambassador in question. The trial judge ruled that the tests were not admissible for the purposes of simulating the collision in this case. Morton v. Hardwick Stove Co., 138 So.2d 807 (Fla. 2d DCA 1961), cert. denied, 149 So.2d 48 (Fla. 1962).
As previously indicated, the tests and 1977 design changes were admitted by the trial court on two bases. We consider that the trial court's ruling cannot be supported on the basis that subsequently acquired knowledge may have imposed a duty to warn, and this point will be amplified in our discussion hereinafter of the third point raised by appellant. We, therefore, focus on the propriety of the trial court's admission of the evidence (of testing and design changes) for the purpose of showing design alternatives.
The basic rule, of course, is that evidence of repairs or improvements to premises made after injury is not admissible *465 to show the culpability of a defendant. Seaboard Air Line Ry. Co. v. Parks, 89 Fla. 405, 104 So. 587 (1925). As the court said in Parks:
The effect of declaring such evidence competent is to inform a defendant that if he makes changes or repairs he does it under penalty; for, if the evidence is competent, it operates as a confession that he was guilty of a prior wrong... True policy and sound reason require that men should be required to improve, or repair, and not to be deterred from it by the fear that if they do so their acts will be construed into an admission that they had been wrongdoers. A rule which so operates as to deter men from profiting by experience, and availing themselves of new information has nothing to commend it, for it is neither expedient nor just.
104 So. at 588-589. See also City of Miami Beach v. Wolfe, 83 So.2d 774 (Fla. 1955).
Where an allegedly defective product is involved, and the improvement (or test) is subsequent to manufacture but prior to injury, the problem is more complex. The plaintiffs argue that since the tests and modifications occurred prior to the accident, the basic exclusionary rule in regard to repairs or improvements is inapplicable. See Rozier v. Ford Motor Co., 573 F.2d 1332 (5th Cir.1978). They also contend that the rule has no application in cases involving the doctrine of strict liability. See, e.g., Caprara v. Chrysler Corp., 52 N.Y.2d 114, 436 N.Y.S.2d 251, 417 N.E.2d 545 (N.Y. 1981).
Similar arguments were rejected in Ellis v. Golconda Corp., 352 So.2d 1221 (Fla. 1st DCA 1977), cert. denied sub nom., Peterson v. McKensie Tank Lines, Inc., 365 So.2d 714 (Fla. 1978), which involved an improved valve manufactured after the allegedly defective valve but prior to the accident and injury. In holding such evidence inadmissible, the First District stated:
At minimum, plaintiff, in a product liability case involving long passage of time between manufacture and injury, is required to produce evidence that the product was defective when it left defendant's hands. Strict liability in tort does not connote liability without fault. That the manufacturer subsequently improved the product it placed in commerce with new materials and technology is not an evidentiary fact ipso facto [from which] to infer negligence in the manufacture of the original product. The trial court correctly held that McKenzie's proffer of tests, designs and comparisons of the second Rego valve was not relevant to the issue and thus not admissible.
Id. at 1224.
In that case, however, the court's decision was predicated on the fact that the improved valve was based on technology not available when the allegedly defective valve was manufactured. Golconda at 1224.[3] This is not true in the instant case. Indeed, in its appellate brief, AMC states that it "did not contest the plaintiffs' contention that the design changes would have been technologically feasible at the time the 1974 models were produced."
AMC argues, however, that since there was no controversy as to the earlier feasibility of the subsequent improvements, the feasibility exception to the exclusionary rule does not apply. In support of this argument, AMC relies on a recent federal case: Bauman v. Volkswagenwerk AG, 621 F.2d 230 (6th Cir.1980). We do not understand this circuitous reasoning. At most, this argument would lead to the conclusion that the disputed evidence was cumulative in respect to a conceded point, and its admission, therefore, would be harmless error.
A reasonable and clear exposition of the law in respect to the feasibility exception to the repair doctrine, which we adopt with approval, was set forth by the Seventh Circuit Court of Appeal in Mahoney v. Roper-Wright Manufacturing Co., 490 F.2d 229, 232 (7th Cir.1973):
In products liability cases, the law in Illinois for some time now has permitted the *466 introduction of evidence which consists of alternate design feasibility or post-accident design changes. The evidence is admissible if the design alternative or design alteration was available at the time the defendant's product was manufactured and sold... . The products liability cases cited above and pursued on a theory of strict liability all held that evidence of design alternatives and post-accident design changes is admissible to show what was feasible and what the defendant knew or should have known.
Although AMC argues that feasibility of proposed design alternatives was not an issue at trial, there was no explicit admission to the effect by AMC and it is foreclosed from that argument by reason of its successful request for a jury instruction which shows that feasibility of alternative designs was a controverted issue. That instruction was:
In determining the reasonableness of the design of a product, among the facts that you are to consider are conformity of the design to the practices of other manufacturers in the industry at the time of the accident. The extent of the buyer's use of the products and a period of time involved in such use, the ability of the manufacturer to eliminate the danger by a feasible design alternative without impairing the product's usefulness or making it unduly dangerous and the relative likelihood of injury resulting from the product's actual design.
AMC also contends that the trial evidence failed to establish that the fuel system modifications in 1977 had any relevance, absent a relocation of the entire fuel tank to the kick-up area, to the particular injury in this case. In other words, given the tremendous impact between the 74,000-pound loaded truck and the rear of the Ambassador, the 1977 modifications resulting from prior AMC testing were unrelated to the fire which engulfed the car after impact; hence, evidence of such tests and such modifications was irrelevant and prejudicial.
This point, although a strong jury argument, fails to recognize that there was conflicting trial testimony relating to the origin of the fire, the leakage caused by the alleged defects, and the relationship between the defects and the damage to the car, which in turn related to speed of the vehicles and force of impact.[4] These were jury issues.
Therefore, we hold that the trial court did not err, under the instant facts, in admitting evidence of the tests and design changes because of the feasibility exception to the exclusionary rule relating to subsequent repair.
The third point raised on appeal by AMC is that the trial court erred in instructing the jury as to negligence based on AMC's failure to warn of the alleged defect in the 1974 automobile. This case does not involve an inherently dangerous product giving rise to a strict duty to warn. See Tampa Drug Co. v. Wait, 103 So.2d 603 (Fla. 1958). It is difficult to perceive, given the nature of the defect contended by the plaintiffs, what the specific warning would have been that AMC was under a duty to convey. None was suggested to the trial court, and none has been suggested to this court. It is understandable from the instant record how AMC may have altered the design of the 1974 Ambassador to make it safer against fire resulting from rear impact, but no evidence was adduced below to show how any warning from AMC to the owner prior to December 10, 1976, could have prevented or ameliorated the injuries that occurred on that date to the plaintiffs in this case. Only if we were to engage in the speculation that the owner, properly warned, would not have purchased the car, or would not have allowed it to be driven on interstate highways, could we recognize a causal relationship between breach of a duty to warn and the instant injury. See Greiner v. Volkswagenwerk AG, 429 F. Supp. 495 (E.D.Pa. 1977). Cf. Drackett *467 Products Co. v. Blue, 152 So.2d 463 (Fla. 1963).
The appellees' reliance in this regard on Rozier v. Ford Motor Co., 573 F.2d 1332 (5th Cir.1978), is misplaced, because there it apparently was shown that "a design to correct (the latent defect) was both economically and structurally feasible" after manufacture and before injury. Such evidence was not adduced in the instant case.
The fallacy of the warning argument in the instant case is that it begs the question. If there were a defect in the fuel system of the 1974 Ambassador that caused the injuries to plaintiffs, AMC is liable, irrespective of any warning; if there were not, there is no liability, irrespective of any failure to warn. Consequently, the warning issue, under these facts, is irrelevant. The trial court erred in denying AMC's motion for a directed verdict on the failure to warn issue and in charging the jury on that issue.
We find appellant's fourth and fifth points relating to the applicability of the strict liability theory to crashworthiness cases and the sufficiency of the evidence to be without merit. The sixth point is moot because of our reversal for a new trial based on appellant's first issue.
By way of cross-appeal, plaintiffs Ellis and St. John challenge the trial court's directed verdict against them on their claim for punitive damage.
Punitive damages are damages over and above such sum as will compensate a person for his actual loss. The purpose is to punish the wrongdoer and to deter him and others from such wrongdoing in the future. Winn & Lovett Grocery Co. v. Archer, 126 Fla. 308, 171 So. 214 (1936). The wrongful act must be characterized by some circumstance of aggravation, such as wilfulness, recklessness, maliciousness, outrageous conduct, oppression or fraud. See, e.g., 17 Fla.Jur.2d Damages § 119 (1980).
Appellants contend that AMC acted with knowledge and reckless indifference to the rights and safety of others sufficient to support an award of punitive damages, and thus the trial court erred in granting AMC's motion for directed verdict. A motion for directed verdict should not be granted when there is any reasonable evidence upon which a jury could legally predicate a verdict in favor of the non-moving party. Hartnett v. Fowler, 94 So.2d 724 (Fla. 1957). In considering a motion for directed verdict for the defendant, the court is required to evaluate the testimony in the light most favorable to the plaintiff and every reasonable inference deduced from the evidence must be indulged in plaintiff's favor. Id. at 725.
In the present case, there was evidence adduced from which the jury could have found that AMC was aware of the catastrophic results of fuel tank fires in its vehicles from its own crash tests, and that AMC chose not to implement the recommendation of its engineers to relocate the fuel tank in order to maximize profits. The jury also could reasonably believe that unless and until compelled to do so by the federal government, AMC failed to conduct further crash tests or experiments to determine feasible alternatives despite its knowledge that its present design could not survive crash tests at relatively low speeds.
In a similar products liability case involving the fuel tank rupture of a Ford Mustang, the Supreme Court of Wisconsin held that punitive damages were recoverable in an action based on either strict liability in tort or on negligence. Wangen v. Ford Motor Co., 97 Wis.2d 260, 294 N.W.2d 437 (1980). The court recognized that punitive damages were not appropriate in every products liability case, but where the plaintiff is able to show that the manufacturer knew that its product was defectively designed and that injuries and deaths had resulted from the design defect, but continued to market the product in reckless disregard of the public safety, punitive damages could be awarded. Id. 294 N.W.2d at 444.
The court in Wangen determined that the facts pleaded in the complaint and reasonable inferences therefrom were sufficient to state a claim for punitive damages. The complaint alleged that Ford knew of the *468 defects in the design of the gas tank and filler neck and in the lack of a barrier between the gas tank and passenger compartment in the 1967 Mustang, and of the fire hazard associated with the design, because of tests run by Ford as early as 1964; that for years before this accident Ford knew that these defects were causing serious burn injuries to occupants of these and similar cars; that years before the accident involved in that case, Ford knew how to correct these defects in ways that would have prevented the plaintiff's burns, but Ford intentionally concealed this knowledge from the public; that despite this knowledge, Ford deliberately chose not to recall its 1967 Mustangs and not to disclose the defects to the public by the issuance of warnings because Ford wanted to avoid paying the costs of recall and repair and in order to avoid the accompanying bad publicity; and that Ford's conduct was intentional, reckless, wilful, wanton, gross and fraudulent.
Punitive damages have been allowed in cases involving products other than automobiles. For example, in Atlas Prop. Inc. v. Didich, 213 So.2d 278 (Fla. 3d DCA 1968), cert. dismissed, 226 So.2d 684 (Fla. 1969), the evidence showed the defendant had been warned of the danger of failing to cover the swimming pool drain; that defendant chose to save money rather than correct a known dangerous condition; and that the defendant failed to warn its tenants of the dangerous condition.
As the foregoing cases illustrate, punitive damages have been allowed where the defendant had knowledge of a defect or dangerous condition and chose not to remedy the condition. While there was abundant evidence adduced at trial below that AMC simply made a valid business decision to retain the rear-end fuel tank location, such evidence does not totally negate the reasonable inference from plaintiffs' evidence that AMC was aware that the fuel tank in its 1974 Ambassador was defective and dangerous, but chose not to seek safer alternative designs. In view of this inference, the trial court erred in directing a verdict in favor of AMC and a new trial on punitive damages is mandated.
The cross-appellants (plaintiffs) also contend that the trial court abused its discretion in refusing to admit into evidence crash test 508 and the results of all sequential testing in which the rear-end crash tests followed front-end crash tests on the same vehicle. The crash tests were excluded on the ground that they failed to simulate the collision in this particular case.
Testing conditions in an experiment must be substantially the same as those at the time of the occurrence for evidence of the experiment to be admitted. Morton v. Hardwick Stove Co., 138 So.2d 807 (Fla. 2d DCA 1961), cert. denied, 149 So.2d 48 (Fla. 1962). Crash test 508 was designed to evaluate the feasibility of complying with proposed federal regulations by installing the fuel tank in the "kick-up" area and by installing the spare tire in the area previously used for the fuel tank. The vehicle involved apparently did not have a fuel filler system as did the Ambassador involved in this case. The vehicles involved in sequential testing suffered multiple impacts with the rear-end collisions following the front-end collisions. As both sets of experiments involved significant changes, the trial court did not abuse its discretion in excluding this evidence.
The trial court admitted into evidence AMC's Exhibit No. 6, a study prepared for the United States Department of Transportation entitled National Crash Severity Study Statistics. The plaintiffs objected to the admission of the study on the grounds that it was hearsay, that AMC failed to authenticate the report and that the report lacked relevancy. The report is admissible under the public record exception to the hearsay rule. See Bell v. Kendrick, 25 Fla. 778, 6 So. 868 (1889). The plaintiffs have conceded that the study was a government report, and thus the lack of proper authentication was harmless error. The study also appears to be relevant. Throughout the trial, AMC argued that the only alternative to the fuel system design in the 1974 Ambassador was to relocate the *469 fuel tank in the "kick-up" area. AMC, however, claimed that this design increased the risk to the passengers from side collisions. The study contains information concerning areas of damage to the automobile which would tend to support AMC's position. It was properly admitted by the trial court.
Accordingly, this cause is reversed and remanded for new trial consistent with this opinion.
REVERSED and REMANDED.
ORFINGER, J., concurs.
COWART, J., concurs in part, dissents in part, with opinion.
COWART, Judge, concurring in part and dissenting in part:
I concur with the majority opinion except for the portion which reverses the trial judge's determination that the evidence as a matter of law would not support an award of punitive damages against AMC. Although AMC knew that there was some danger of fire resulting from placement of the fuel tank beneath the trunk floor, AMC chose to place it there, rather than in the kick-up area, because its engineers had determined that placement in the kick-up area would increase the risk of fires from side collisions. Eventually, the tank was moved to the kick-up area, but only to allow the automobile to comply with government standards, which AMC's engineers thought did not duplicate real world conditions. Even assuming that the AMC engineers were wrong in these determinations, at most that could only amount to negligence, not the malicious refusal to implement a "safer" design required to support an award of punitive damages.
The majority states that failure to build to a safer design "in order to maximize profits" should support an award of punitive damages here. Any product, especially an automobile, can always be redesigned to increase user safety. However, increases in safety necessitate increases in cost; a perfectly safe automobile would be unaffordable. Therefore, in order to retain a salable product, the manufacturer is always forced to reduce the safety of the design by some amount from the ideal. Therefore, for any given product, the manufacturer will always have failed to make the product safer because of considerations of profit. Such practical economic considerations are not at all wrongful, much less malicious. If these considerations are made the foundation for punitive damages, then any negligent failure of a manufacturer will subject him to punitive damages.
I would affirm the trial judge's directed verdict on the claim for punitive damages against AMC.
NOTES
[1] That error was committed in this respect is abundantly clear, and this was conceded at oral argument by counsel for appellee.
[2] See Surf Drugs, Inc. v. Vermette, 236 So.2d 108 (Fla. 1970).
[3] Moreover, the court also noted that no competent proof was adduced that the valve was in a defective condition when purchased. 352 So.2d at 1224.
[4] For example, the plaintiffs presented expert testimony from Robert Pautsch, an industrial design engineer, that there would have been no gasoline leakage from the automobile's fuel system in this accident had it been properly located.