451 So.2d 458 (1984)
Clarence JACKSON, Appellant,
v.
STATE of Florida, Appellee.
No. 62723.
Supreme Court of Florida.
May 10, 1984.
Rehearing Denied July 12, 1984.
*459 Jerry Hill, Public Defender, and W.C. McLain, Asst. Public Defender, Bartow, for appellant.
Jim Smith, Atty. Gen., Tallahassee, and Frank Lester Adams, III, Asst. Atty. Gen., Tampa, for appellee.
EHRLICH, Justice.
This is an appeal from final judgment of the trial court imposing two sentences of death. We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution.
A Hillsborough County grand jury indicted Clarence Jackson in October 1981 for the first-degree murders of Roger McKay and Terrance Milton. A jury convicted Jackson on both counts, and recommended death for both murders. The trial court sentenced Jackson to death on the convictions. We reverse.
The key witness at the trial was James Lucas. Jackson often shared heroin and other drugs with Lucas and the victims. Lucas testified at trial that Jackson picked up McKay on a Saturday afternoon in September 1981 near an east-side Tampa bar. As Lucas drove, Jackson, sitting in the backseat, argued with McKay about drugs, then shot him in the back. After driving to a remote area, Jackson shot McKay again as he put him in the trunk of the car. Returning to the bar Saturday evening, Jackson found Milton, took him for a ride with Lucas driving, and shot Milton after arguing about drugs. Milton remained conscious for some time, begging for his life. After driving to another remote area, Jackson had Lucas stop at a bridge where Jackson shot Milton several more times, then dumped both bodies into a backwater of the Hillsborough River. The bodies were found several days later. Lucas eventually told detectives about the murders and Jackson's arrest and subsequent trial were the result. Jackson relied on an *460 alibi defense, taking the stand as the only defense witness in the guilt phase and testifying that he was at home with his wife and son during key periods of the weekend of the murders.
Jackson raises two issues of merit from the guilt phase of his trial, and one from the sentencing phase.
The first issue urged in the guilt phase concerns testimony from Sylvester Dumas, a state witness. During direct examination by the state, Dumas testified about an occasion when Jackson had pointed a gun at him and boasted of being a "thoroughbred killer" from Detroit. Jackson's defense counsel interrupted the testimony to object to the line of questioning on relevancy grounds, and was overruled.[1] Jackson argues that the testimony had no valid probative value and only tended to show bad character or propensity, and therefore is inadmissible. § 90.404(2)(a), Fla. Stat. (1979); Drake v. State, 400 So.2d 1217 (Fla. 1981); Williams v. State, 110 So.2d 654 (Fla.), cert. denied, 361 U.S. 847, 80 S.Ct. 102, 4 L.Ed.2d 86 (1959).[2]
*461 Before addressing the merits of this point, we must deal with the state's contention that defense counsel failed to raise a contemporaneous objection adequate to preserve the issue for appellate review. A contemporaneous objection is required to preserve error other than fundamental error for appellate review. Castor v. State, 365 So.2d 701 (Fla. 1978). The objection must be both timely and "sufficiently specific both to apprise the trial judge of the putative error and to preserve the issue for intelligent review on appeal." Id. at 703. The state argues the objection in the instant case was neither timely nor sufficiently specific.
An objection need not always be made at the moment an examination enters impermissible areas of inquiry. In Roban v. State, 384 So.2d 683 (Fla. 4th DCA), review denied, 392 So.2d 1378, 1379 (Fla. 1980), objection to an impermissible gratuitous comment by a witness was made several questions after the objectionable testimony. The district court found the objection timely because the question put to the witness was within the time frame for a contemporaneous objection. In the case now before us, objection was made during the impermissible line of questioning, which is sufficiently timely to have allowed the court, had it sustained the objection, to instruct the jury to disregard the testimony or to consider a motion for mistrial.
As to the state's contention that the objection was not adequately specific, we note that relevancy, the ground for objection at trial, goes to the heart of the objectionable testimony at issue here. In Williams this Court held that "evidence of any facts relevant to a material fact in issue except where the sole relevancy is character or propensity of the accused is admissible unless precluded by some specific exception or rule of exclusion." 110 So.2d at 661 (emphasis added). While the objection could have been more specific, we find the objection to have been adequate.
Turning to the merits of the issue, we agree with Jackson that the testimony was impermissible and prejudicial. We envision no circumstance in which the objected to testimony could be "relevant to a material fact in issue," nor has the state suggested any. The testimony showed Jackson may have committed an assault on Dumas, but that crime was irrelevant to the case sub judice. Likewise the "thoroughbred killer" statement may have suggested Jackson had killed in the past, but the boast neither proved that fact, nor was that fact relevant to the case sub judice. The testimony is precisely the kind forbidden by the Williams rule and section 90.404(2). As the Third District Court of Appeal said in Paul v. State, 340 So.2d 1249, 1250 (Fla. 3d DCA 1976), cert. denied, 348 So.2d 953 (Fla. 1977),
[t]here is no doubt that this admission [to prior unrelated crimes] would go far to convince men of ordinary intelligence that the defendant was probably guilty of the crime charged. But, the criminal law departs from the standard of the ordinary in that it requires proof of a particular crime. Where evidence has no relevancy except as to the character and propensity of the defendant to commit the crime charged, it must be excluded [citing to Williams].
The second error urged by Jackson occurred when the trial judge declared a state witness, Sutton, to be adverse, allowing the witness to be cross-examined and impeached by the party who called him. Based on statements made to detectives and the state attorney during the investigation, the state expected Sutton to testify that he saw Jackson chase the two victims out of a bar the night before the murders, and that Jackson then asked Sutton where *462 McKay and Milton had gone because they had robbed him and he was "going to get them." The state also expected Sutton to testify he met Lucas and Jackson at Jackson's car early Sunday morning, shortly after the murders. This would corroborate eyewitness Lucas' testimony that such an encounter occurred and also would refute Jackson's alibi, that he was at home at the time.
However, in the initial direct examination Sutton failed to give the testimony about the robbery and threat, and was confused about the day he saw Lucas and Jackson in Jackson's car, eventually settling on early Monday morning. At this point the state attorney asked the court to declare Sutton a hostile witness. After a lengthy bench discussion, the trial judge declared Sutton to be adverse. This allowed the state to cross-examine and impeach Sutton, § 90.608(2), Florida Statutes (1979), whereupon Sutton cleared up his confusion about when he saw Lucas and Jackson and testified he saw them early Sunday. However, Sutton said he didn't remember telling investigators about the robbery and threat. The state then impeached Sutton by eliciting testimony from two detectives regarding the prior inconsistent statements.
The trial court was in error in declaring Sutton to be adverse and in permitting him to be impeached. A mere lapse of memory is insufficient to render a witness adverse. In a seminal decision addressing the problem of forgetful witnesses, this Court held:
It is very erroneous to suppose that, under this statute [§ 1101 Rev.Stat.Fla. (1892), precursor to § 90.608(2), Fla. Stat. (1979)], a party producing a witness is at liberty to impeach him whenever such witness simply fails to testify as he was expected to do, without giving any evidence that is at all prejudicial to the party producing him. The impeachment permitted by the statute is only in cases where the witness proves adverse to the party producing him. He must not only fail to give the beneficial evidence expected of him, but he must become adverse by giving evidence that is prejudicial to the cause of the party producing him. When a party's witness surprises him by not only failing to testify to the facts expected of him, but by giving harmful evidence that is contrary to what was expected, then, as is the purpose of this law, he is permitted to counteract the prejudicial effect of the adverse testimony of such witness, by proving that he has made statements on other occasions that are inconsistent with his present adverse evidence. It never was the purpose of this statute to allow a party to put up a witness for the purpose of endeavoring to get from him beneficial evidence, and upon his simple failure to testify to the desired facts, to permit him to get the benefit of those expected facts, as substantive evidence through the mouth of another witness, under the guise of impeachment. Evidence adduced in this manner is nothing more than the veriest hearsay, and is inadmissible. Even where a witness is properly impeached by proof of conflicting statements made on other occasions, the conflicting statements as made to and detailed by the impeaching witness should not be considered as substantive evidence in sustenance of the party's cause who produced the impeached witness; but has weight only for the purpose of counteracting or annulling the harmful effects of the adverse testimony in the cause given by the impeached witness that is inconsistent with his statements testified to have been made on other occasions.
Adams v. State, 34 Fla. 185, 195-96, 15 So. 905, 908 (1894) (citations and emphasis deleted) (quoted in Hernandez v. State, 156 Fla. 356, 366-67, 22 So.2d 781, 785-86 (1945)).
The principles enunciated in Adams have retained their vitality. See, e.g., Gibbs v. State, 193 So.2d 460 (Fla. 2d DCA 1967); Johnson v. State, 178 So.2d 724 (Fla. 2d DCA 1965); 5 C. Ehrhardt, West's Florida Practice, Florida Evidence 169-70 (1977). Although we find no case on point decided *463 under the current evidence code, we perceive no reason to conclude that the principles are any less applicable, with the exception that section 90.608 no longer requires the calling party to be surprised by the prejudicial testimony. Sutton's lapses of memory were not "affirmatively harmful" and thus could not be the basis for declaring him adverse or allowing him to be impeached. Compounding the error, the state used the impeaching testimony of the two detectives as substantive evidence in closing argument, clearly forbidden by Adams and more recent cases. See Rankin v. State, 143 So.2d 193 (Fla. 1962); Perry v. State, 356 So.2d 342 (Fla. 1st DCA), cert. denied, 364 So.2d 889 (Fla. 1978); Pitts v. State, 333 So.2d 109 (Fla. 1st DCA 1976).
The two errors discussed above are prejudicial and necessitate reversal of Jackson's conviction and remanding for a new trial. However, Jackson urges one further error which we will address in the event of retrial. During the sentencing phase, the trial judge found McKay's murder to be especially heinous, atrocious or cruel, one of the statutory aggravating circumstances of section 921.141(5), Florida Statutes (1981). In his findings in support of the death sentence, the trial judge relied on evidence that McKay "was shot in the back, put in the trunk while still alive, wrapped in plastic bags, and subsequently shot again while still alive." The findings go on to outline Jackson's actions in attempting to conceal the murder, washing the car and trying to repair the bullet hole in the car seat, before seeking out the second victim. Actions after the death of the victim are irrelevant in determining this aggravating circumstance. Herzog v. State, 439 So.2d 1372 (Fla. 1983). Also, when the victim becomes unconscious, the circumstances of further acts contributing to his death cannot support a finding of heinousness. Id. at 1380. The record contains no evidence that McKay remained conscious more than a few moments after he was shot in the back the first time, and he therefore was incapable of suffering to the extent contemplated by this aggravating circumstance.
Accordingly, we reverse the defendant's convictions and remand to the trial court for a new trial.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON, McDONALD and SHAW, JJ., concur.
ADKINS, J., dissents.
NOTES
[1] The testimony was presented as follows [Assistant state attorney Bruce Berger questions, Dumas answers]:

Q. How about Mr. Jackson, the Defendant in this case; did he carry a gun?
A. From the first time I met him he always had a gun.
Q. What type of gun?
A. I saw several guns that he had. I know of a .44 magnum. At one time he opened the trunk of his Volvo and showed us some bulletproof vests.
Q. What did they look like?
A. Bulletproof vests, you know. Breastplates.
Q. Ever see those before in your life?
A. Yes, sir.
Q. You know what a bulletproof vest looks like?
A. Yes, sir.
Q. What kind of guns did he have in that Volvo?
A. I saw a .44 magnum, it was a .32, and there were two carbine type rifles. And there were another hand pistol. I am not sure of the caliber.
Q. What did he say about these guns?
A. He would always brag about them. He told me that that was his occupation.
Q. What was his occupation?
A. Said that he was a killer. Told me he was a killer. He was a thoroughbred killer.
Q. Where did he do his killing?
A. He told me he was a killer in his heyday in Detroit.
Q. Why did he tell you this, Sylvester?
A. One day we were about to inject some heroin and I had purchased part of the heroin. I fixed up and I was about to inject myself. And everyone there all of a sudden say, "No, no, you can't get off before Unc." And I say, "What you mean, I can't get off before Unc? I bought this, I am fixin' to do mine." And say, "Nobody gets off before me. Nobody gets off before me." And I say, "Well, I'll tell you what, Unc, you give me my money back or somethin' `cause I'm going to do what I bought." And when I got ready to inject myself again he pulled his gun out and set up, he say, "Nobody" 
Q. What type of gun? I am sorry. What type of gun?
A. The .44 magnum.
MR. SIMMS [defense counsel]: I am going to object to the relevancy of this line of questioning.
THE COURT: Overruled.
Q. Go ahead, tell us, tell the jury.
A. He pulled his .44 magnum and set up and say, "No one gets off before me." And I told him, I say, "Well, Unc, look, if you ain't going to give me my money back or whatever you can do whatever you going to do 'cause I'm gonna do my own." So he kinda laughed and he change his whole attitude. He say, "you know what, that is why I can't mess with you." He say, "You a little bit too tough for me." He say, "You remind me of me in my heyday when I was in Detroit." He say, "When I used to do all the things I used to do." And we all were askin', "What things you used to do, Unc?" And he say, you know, "I used to be a killer. and I am a thoroughbred killer. I know how to kill somebody and do it right." And this was all the time. This was his main brag word. That he was a thoroughbred killer.
[2] Section 90.404(2) reads:

(2) OTHER CRIMES, WRONGS, OR ACTS. 
(a) Similar fact evidence of other crimes, wrongs, or acts is admissible when relevant to prove a material fact in issue, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, but it is inadmissible when the evidence is relevant solely to prove bad character or propensity.
(b) 1. When the state in a criminal action intends to offer evidence of other criminal offenses under paragraph (a), no fewer than 10 days before trial, the state shall furnish to the accused a written statement of the acts or offenses it intends to offer, describing them with the particularity required of an indictment or information. No notice is required for evidence of offenses used for impeachment or on rebuttal.
2. When the evidence is admitted, the court shall, if requested, charge the jury on the limited purpose for which the evidence is received and is to be considered. After the close of the evidence, the jury shall be instructed on the limited purpose for which the evidence was received and that the defendant cannot be convicted for a charge not included in the indictment or information.